Margaret **FLANIGAN**, Appellant,

v.

**CITY OF KANSAS CITY, Missouri,**
**Respondent,**

**Division of Employment Security,**
**Respondent.**

No. **WD 51726.**

Missouri Court of Appeals,
Western District.

Submitted April 10, 1996.

Decided May 21, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 2, 1996.

Application to Transfer Denied
Aug. 20, 1996.

Samuel I. McHenry, Kansas City, for appellant.

Cecilia O. Abbott, Ronnae L. Coleman, Mo. Div. of Employment Security, Kansas City, for respondents.

Before LAURA DENVIR STITH, P.J.,
and ULRICH and SMART, JJ.

SMART, Judge.

Margaret Flanigan appeals the decision of the Labor and Industrial Relations Commission affirming the decision of an appeals tribunal to deny her six weeks of unemployment compensation benefits. She contends the commission erred in affirming the finding

that she was discharged from her employment for misconduct. She claims she was not guilty of misconduct because the actions precipitating her discharge resulted from a psychological condition known as "factitious disorder," rendering her a victim of uncontrollable tendencies. Her inability to control these tendencies, she contends, negated culpability for her actions. Therefore, she argues, her actions could not be found to be "misconduct" within the meaning of § 288.050.2, RSMo 1994.[1]

### Factual Background

Appellant Flanigan was employed by the City of Kansas City, Missouri, in the Department of Revenue. She began working for the City in 1986. In October, 1992, she informed the Commissioner of Revenue and her fellow employees that she had terminal cancer. For the next two years, the claimant frequently reported on her symptoms and her medical procedures. She reported experiencing severe pain. Co-workers were upset to learn of her suffering. Sympathetic tears were shed by co-workers at their desks. Co-workers prayed for Ms. Flanigan and found ways to try to support her, such as providing food. In March, 1993, Ms. Flanigan was given a flexible work schedule so she could start early and leave work early. Later, arrangements were made for her to be allowed to work at home from a personal computer. In October, 1993, her duties were modified so she could work in a training position. Because of her frequent absences, schedules often had to be changed. Since she did not have sufficient vacation and sick leave time to cover her absences, other employees donated a total of 280 hours of sick leave to her account. Claimant's condition became more debilitated as time went by, to the point that she was using a walker when venturing out. In October, 1994, she told other employees she had been to the hospital and that a biopsy had been performed on her right lung. She described having difficulty breathing and said she was vomiting. She told her co-workers that the doctors did not know what to do and that she was trying to find a cure on her own. On October 31, she informed co-workers she was "on her death bed" and in extreme pain.

On November 22, 1994, Ms. Flanigan's sister confronted the appellant with suspicions that Ms. Flanigan did not really have cancer. Ms. Flanigan initially insisted that she did have cancer. A few days later, appellant admitted she did not have cancer. The truth was that she had never been diagnosed with cancer, and had never even sought medical care for cancer. She had obtained books about cancer so she could speak intelligently about cancer. After this confrontation, on December 1, 1994, Ms. Flanigan began consulting with a psychologist. About that same time, she informed her immediate supervisor she was feeling better and wanted to start working more regular hours. In her computer message to her supervisor, she said she wanted to start coming in on a more regular basis: "I will have to give it a try to see what kind of hours I can put in in the office, but I think it would be healthier for me to work there than here at home so much. There will still be doctor appointments and such, but you have always been good about letting me work around them and I would assume that still will be okay." On December 21, 1994, prior to an employee Christmas gift exchange, appellant told five co-workers that she did not have cancer. She asked them not to tell anyone until she had a chance to inform her supervisor herself. On January 3, 1995, the Commissioner of Revenue, having heard indirectly that appellant had been lying about her condition, confronted appellant. Appellant was suspended pending a hearing, and thereafter terminated for conduct reflecting discredit to the city, misconduct, falsification of reports, withholding information, and hindering city operations. Appellant exercised her appeal rights as to the termination without avail.

Appellant also claimed unemployment compensation benefits. Her claim was opposed by the city. Section 288.050.2, RSMo Supp. 1995 provides that when a claimant has been discharged for misconduct connected with work, the claimant shall be disqualified for waiting week credit or benefits "for not less than four nor more than sixteen weeks" for

1. All statutory references are to RSMo 1994, unless otherwise indicated.

which the claimant seeks benefits and is otherwise eligible. A deputy with the Division of Employment Security found she was not disqualified for any benefits. He found her discharge was not for misconduct because, he found, appellant believed she did have cancer. The deputy's determination was appealed by the city. Contrary to the findings of the deputy, the appeals tribunal found that the discharge was for work related misconduct. The appeals tribunal found appellant was disqualified for six weeks of waiting week credit or benefits under § 288.050. Ms. Flanigan then filed her application for review with the Labor and Industrial Relations Commission, which affirmed the decision of the appeals tribunal and adopted the written decision of the tribunal. She now appeals the decision of the Commission pursuant to § 288.210.

### Misconduct

On appeal, she contends the commission erred in its determination because there was not sufficient competent evidence in the record to warrant the making of the award because the evidence shows that the employee was discharged due to a "mental/emotional disability," a psychological disorder known as "factitious disorder." She points to the fact that she cannot be disqualified unless it is determined that she has been discharged for misconduct connected with her work under § 288.050.2. She points out that the evidence shows that she was a good worker, and had favorable reviews of her performance even during the time that she was understood to have cancer. She argues that the uncontradicted evidence of her psychological disorder precludes a determination that she had the necessary culpability to be guilty of misconduct.

The term "misconduct" in the employment security context has been defined as follows:

[M]isconduct ... must be an act of wanton or willful disregard of an employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show

an intentional and substantial disregard of the employer's interest or of the employee's obligations to the employer.

*Powell v. Div. of Employment Sec.*, 669 S.W.2d 47, 50 (Mo.App.1984). Consistent with this concept, the Court of Appeals has also stated:

One purpose of this type of provision is to deny the benevolent benefits of the statute to those who bring about their own unemployment by conducting themselves, as respects their employment, with such callousness, deliberate or wanton misbehavior, or lack of consideration that, to the minds of reasonable men, would justify the employer in discharging the employee . . .

*Continental Research Corp. v. Labor and Indus. Relations Comm'n of Mo.*, 708 S.W.2d 749, 750 (Mo.App.1986).

### Standard of Review

In considering an appeal from the Labor and Industrial Relations Commission, this court "reviews the evidence in a light most favorable to the findings and decision of the Commission and must disregard all opposing and unfavorable evidence." *Burns v. Labor & Indus. Relations Comm'n*, 845 S.W.2d 553, 555 (Mo. banc 1993). The reviewing court defers to the judgment of the commission when judging the credibility of each witness. *Clark v. Labor and Indus. Relations Comm'n*, 875 S.W.2d 624, 626 (Mo. App.1994).

### The Evidence

We turn to Ms. Flanigan's own testimony, given before the appeals tribunal, in evaluating the decision of the Commission:

Q. It was indicated that you were—Mr. Walstrom indicated that in October, 1992, you went to him and informed him that you had terminal cancer. Is that correct, ma'am?

A. Yes.

Q. Did you have terminal cancer at that time?

A. No.

Q. Had you been diagnosed as having terminal cancer at that time?

A. No.

Q. Were you ill at that time?

A. Yes.

Q. With cancer?

A. No.

Q. With what, ma'am?

A. With all the symptoms of cancer. I believed I had cancer even though I was not diagnosed with it. I made myself have all the necessary ailments that should have gone along with it. I purchased cancer manuals so that I could speak intelligently about it and then I made myself have cancer. I—I was ill. Sometimes deathly ill.

Q. When you say you were ill what are you—are you talking about physical symptoms?

A. Yes.

Q. What physical symptoms?

A. Pain in my—in—around—in and around the uterus, in my—I had supposedly had Stage 4B cancer which would have been spread through all the lymph nodes of the body and due to all of that that's where I was experiencing the pain. And so it became difficult for me to have the strength to get out of bed some—somedays.

Q. And did this pain develop after you had read up about it as you said?

A. I would say yes.

Q. Why did you concoct this story about having cancer, ma'am?

A. I don't know.

Q. Why did you say that you had terminal cancer with less than a year to live?

A. I don't know.

Q. Did you—did—did you think at that time that at the end of a year if you hadn't died you were going to have some explaining to do?

A. I—that crossed my mind on a few occasions but I continued with—with all the symptoms.

Q. What did you gain from this story, ma'am?

A. Nothing. Absolutely nothing.

Q. Did you suffer anything as a result of this story?

A. I suffered, yes.

Q. How so?

A. Physically, emotionally. By physically abusing myself with having all these symptoms and all this pain. Sleepless nights, stress. I actually caused my hair to fall out at one point. It was hard to—it was a hard life to—to live for the amount of time that I did this, always having—having to keep myself in check and know what had been discussed and what had been said.

Q. Did you ever see a doctor about this—about the possibility of having cancer?

A. No.

Q. Why not, if you lost your hair?

A. I also knew I had made the story up. I mean it's hard to explain. I can—I knew that I had lied about having cancer, but I also believed I had all the symptoms of the cancer.

\* \* \*

Q. Did there come a point in time when—when anyone in your family or anyone at work found out that you did not—that you—that you did not in fact have cancer?

A. Yes.

Q. When did that happen, ma'am?

A. I'm not sure of the exact date when a family member found out but I was confronted by my sister on November 22 with their concerns that I was possibly lying about having cancer.

Q. Did you admit it at that time?

A. No. I denied it for about a week.

Q. What happened at the end of that period?

A. Well, it was like I was in a corner and I didn't know which way to turn. And short of suicide there was no way out other than telling the truth and so that's what I did. I came forward.

The stipulated testimony of Beth Carriedo, Ph.D., Psychologist, was also presented to the appeals referee:

Ms. Flanigan has been a client of mine in psychotherapy since December, 1994. She has been diagnosed with factitious disorder. This psychiatric disorder is characterized by intentionally produced physical symptoms. This production of symptoms is considered voluntary only in the sense that it is deliberate and purposeful but not in the sense that it can be controlled. This act (simulating illness) has "a compulsive quality in that the patient is unable to refrain from a particular behavior even if its dangers are known" (DSM III–R—Diagnostic and Statistical Manual of Mental Disorders). In sum, Ms. Flanigan's psychiatric disorder led her to behave and at times believe that she was ill.

The Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. (DSM–IV), published by the American Psychiatric Association, which was also introduced at the hearing and considered by the appeals tribunal, describes this disorder as the "intentional production of physical or psychological signs or symptoms." The manual says that the motivation for the behavior is a desire "to assume the sick role." Factitious disorder differs from malingering, according to the manual, in that malingering is generally motivated by external incentives (avoiding work, responsibility, or some unpleasant experience). The manual goes on to describe the disorder:

Individuals with factitious disorder usually present their history with dramatic flair, but are extremely vague and inconsistent when questioned in greater detail. They may engage in pathological lying, in a manner that is intriguing to the listener, about any aspect of their history or symptoms (i.e., pseudologia fantastica). They often have extensive knowledge of medical terminology and hospital routines. Complaints of pain and requests for analgesics are very common. After an extensive work-up of their initial chief complaints has proved negative, they often complain of other physical or psychological problems and produce more factitious symptoms. Individuals with this disorder may eagerly undergo multiple invasive procedures and operations. While in the hospital, they usually have few visitors. Eventually, a point may be reached at which the factitious nature of the individual's symptoms is revealed (e.g., the person is recognized by someone who encountered the patient during a previous admission; other hospitals confirm multiple prior hospitalizations for factitious symptomatology). When confronted with evidence that their symptoms are factitious, individuals with this disorder usually deny the allegations or rapidly discharge themselves against medical advice. Frequently, they will be admitted to another hospital soon after. Their repeated hospitalizations often take them to numerous cities, states and countries.

Ms. Flanigan contends on appeal that the existence of the foregoing evidence in the record absolutely precludes a finding by the Labor and Industrial Relations Commission that she was guilty of misconduct associated with her work. We disagree.

### Emotional Disorder

■ Although there are many forms of neuroses, nervous disorders, and manifestations of psychological illness, the existence of a diagnosis of illness does not necessarily excuse the individual from responsibility for actions. The evidence showed that Ms. Flanigan had a compulsive need to assume the sick role, but the evidence did not establish that Ms. Flanigan was insane, that she was incapable of knowing right from wrong, or incapable of discerning the truth about her health. The evidence is also somewhat contradictory as to whether her particular emotional disorder could properly be considered "factitious disorder" because her actions substantially differed from the textbook description of the conduct of a person with this disorder. The fact that Ms. Flanigan never consulted a physician for cancer tends also to undermine her suggestion that she really believed that she had cancer. Her psychologist stated that "at times" Ms. Flanigan believed it, without reference to when those times occurred. Even assuming that the Commission accepted the testimony that at times Ms. Flanigan believed the lie, it would have been reasonable to conclude that at other times she knew she did not have cancer. Furthermore, the Commission could

have found that her deception was a self-deception for which she was at least partially, if not fully, responsible even though the lie may have become the prevailing paradigm of her thought. Thus, even granted that the claimant suffered from a very significant emotional disorder, the Commission was not required to conclude that the claimant should be treated entirely as a victim. The evidence showed that Ms. Flanigan chose consciously and purposefully to educate herself on cancer so she would be able to deceive more thoroughly. She accepted donated sick leave amounting to several thousand dollars so she would not personally have to pay a financial price for her fictional case of cancer, while others sacrificed the sick leave to their detriment. Even apart from accepting sick leave, her lies could be regarded as a pernicious betrayal and abuse of her relationships. Her assertion on appeal that her actions hurt no one other than herself is perhaps the least savory of any of her representations. It is a rejection of the reality that she violated her relationship with her supervisors, friends and co-workers. She sought, through deception, to obtain their sympathy and attention to meet her emotional needs, while treating their interests with utter disregard.

The appeals tribunal, which had discretion under § 288.050.2 to disqualify the appellant for a period of up to sixteen weeks, disqualified her for six weeks of credit or benefits. While recognizing that Ms. Flanigan was suffering from an emotional disorder, the appeals tribunal found she was not without some responsibility:

> The claimant was aware that she had not been diagnosed with cancer.... She did not take steps to help herself by seeking medical treatment. She did not seek counseling because she wanted to get better, but because her sister finally told her that the family suspected she was lying. Even after the claimant began treatment, she waited for almost a month before telling co-workers that she had lied about her situation from the onset. She then asked those co-workers not to disclose this lie, but to participate in the lie by keeping silent. Instead of immediately facing up to her responsibility, the claimant again delayed telling her employer.

* * *

> The claimant's acceptance of donated [sick] leave, her request that other employees keep silent after she had admitted her lie to them, and her intentional delay in notifying the employer of her situation, were deliberate acts against the employer's interest in the proper use of sick leave and modified work arrangements, and demonstrated her indifference to standards of honest behavior and the need for trust in the workplace. Therefore, the Appeals Tribunal concludes that the claimant was discharged on January 10, 1995, for misconduct connected with work.

We conclude that there was sufficient competent evidence in the record to support the decision of the Labor and Industrial Relations Commission.

The decision of the Labor and Industrial Relations Commission is affirmed.

All concur.