**Tamela MILLER, Appellant,**

v.

**KANSAS CITY STATION CORPORATION, and Division of Employment Security, Respondents.**

**No. WD 56047.**

Missouri Court of Appeals,
Western District.

Submitted March 9, 1999.

Decided July 20, 1999.

Nancy Wilson, Kansas City, for appellant.

Sharon A. Willis, Kansas City, for respondent.

Before SMART, P.J.; HANNA and LAURA DENVIR STITH, JJ.

PER CURIAM.

Tamela Miller appeals a decision of the Labor and Industrial Relations Commission ("Commission") disqualifying her from the receipt of seven weeks of unemployment benefits in connection with her discharge from employment by Kansas City Station Corporation ("Station"). The Commission disqualified Ms. Miller from seven weeks of benefits because it concluded that she engaged in misconduct connected with her work. Ms. Miller appeals.

While we agree that Ms. Miller's off-duty conduct was irresponsible, we find no principle of law warranting the conclusion that her actions amounted to misconduct connected with her work within the meaning of Section 288.050.2. The judgment of the Commission is reversed and remanded for reinstatement of Ms. Miller's benefits.

## Factual Background

Tamela Miller was employed by Station from September 23, 1996 until January 8, 1998 as a room service manager. On about December 26, 1997, she began to experience substantial bleeding associated with her pregnancy. The bleeding continued. On December 30, 1997, a day she was not scheduled to work, her physician advised her to stay away from work from Wednesday, December 31, 1997 through January 6, 1998, because of the bleeding. She followed this advice, timely reported her need for sick leave, used sick leave for the absence in compliance with Station's sick leave policy, and returned to work on January 7, 1998. Station terminated Ms. Miller's employment when she returned to work, partially for performance reasons and partially because Station believed Ms. Miller had not conducted herself with the level of loyalty and integrity appropriate to a managerial employee. Station believed that Ms. Miller, although on a doctor's restriction due to an apparently unstable pregnancy, could have worked December 31, a big night for the casino, if she had chosen to do so. Station based its decision on the fact that on the night of December 30, Ms. Miller was observed spending at least five or six hours at another casino, Sam's Town, sitting and watching her husband at the gaming tables. Station suggests that, rather than spending a lengthy time on the night of the 30th at Sam's Town, Ms. Miller should have been resting at home in bed, because, Station argues, such would have been more in keeping with her physician's recommendation to limit her activities.

Ms. Miller applied for unemployment benefits and Station challenged her claim, alleging that she had engaged in misconduct connected with her work. The deputy disqualified Ms. Miller from benefits for seven weeks. The appeals referee upheld the deputy's decision, finding as follows:

> The claimant had been advised by her physician to stay off work. If that advice was necessary, the claimant must have realized that she would be jeopardizing her health, and thus her ability to get to work in the future, by spending hours at a casino when she was supposed to be resting. If the claimant was restricted only from excessive walking and lifting, she should have been able to work on December 31, 1997, since the employer could have accommodated those restrictions, and she returned to work with those restrictions on January 7, 1998. Under those restrictions, the claimant deliberately put herself in a position where she was likely to be too ill to work the next day by going to a casino on December 30, 1997. The claimant cannot have it both ways. She cannot be too sick to work, but not too sick to play.

> The claimant's actions do not show mere poor judgment. At the very least, her actions show an intentional and substantial disregard for her employer's interest in having her at work to do the job she was hired to do, as well as a lack of concern for her own obligation to be at work whenever physically possible and to conduct her private life so that it did not interfere with her ability to work. Therefore, the Appeals Tribunal concludes that the claimant was discharged on January 8, 1998, for misconduct connected with work. Since claimant acted with such extreme disregard for the consequences to her employer, the seven-week disqualification imposed by the deputy is appropriate.

Ms. Miller appealed to the Commission, which affirmed the decision of the Appeals Tribunal by a vote of two to one, with Commissioner O'Neill dissenting. Ms. Miller now appeal to this court.

### Standard of Review

Article 5, § 18 of the Missouri Constitution grants courts the power to review the decisions of administrative bodies, including a determination of whether a decision is "authorized by law." Section 288.210, RSMo Supp.1998, provides that the court, on appeal, may review issues of law and "may modify, reverse, remand for rehearing, or set aside the decision of the [C]ommission" on grounds that:

(1) That the [C]ommission acted without or in excess of its powers;

(2) That the decision was procured by fraud;

(3) That the facts found by the [C]ommission do not support the award; or

(4) That there was no sufficient competent evidence in the record to warrant the making of the award.

■ This court is not bound by the Commission's conclusions of law or the Commission's application of law to the facts. *Division of Employment Sec. v. Taney County Dist. R–III*, 922 S.W.2d 391, 393 (Mo. banc 1996). Where the Commission's decision involves a question of law, we review the issue independently. *George–Brewer v. Penn Mar Southwest*, 980 S.W.2d 147, 149 (Mo.App.1998). Whether or not the Commission's findings support the conclusion that an employee was guilty of misconduct is a question of law. *Pemiscot County Mem'l Hosp. v. Missouri Labor & Indus. Relations Comm'n*, 897 S.W.2d 222, 226 (Mo.App. 1995).

■ Section 288.020.2, RSMo 1994, directs that unemployment security law be liberally construed so as to further the public policy of Missouri in setting aside unemployment reserves to benefit persons unemployed through no fault of their own. *Sokol v. Labor & Indus. Relations Comm'n*, 946 S.W.2d 20, 23 (Mo.App.1997). In keeping with this policy, disqualifying

provisions in the law are strictly construed against the disallowance of benefits. *Missouri Div. of Employment Sec. v. Labor & Indus. Relations Comm'n,* 651 S.W.2d 145, 148 (Mo. banc 1983); *Anchor Sales & Serv. Co. v. Division of Employment Sec.,* 945 S.W.2d 66, 70 (Mo.App.1997).

### Misconduct Associated with Work

In her sole point on appeal, Ms. Miller contends that the Commission erred in denying her claim for unemployment benefits because the Commission concluded that she was guilty of misconduct associated with work. Ms. Miller maintains that in making this assumption, the Commission relied upon inferences unsupported by the record. Specifically, she argues that there was no evidence that being at Sam's Town on the 30 th placed any strain on her pregnancy, and no evidence that if she had stayed home on the 30 th, she would have worked the 31 st. She reminds us that the disqualifying provisions of the statute must be strictly construed. She suggests that because there was no evidence that her casino visit on the night of the 30 th caused her to miss work on the 31 st, her off-duty activities are not properly the basis of her disqualification. She also contends that her physician's recommendation that she stay off work until at least January 6 makes it legally improper to deny her benefits in connection with her discharge for being absent while on sick leave.

Section 288.050.2 allows for the disqualification of a claimant where there is misconduct connected with the claimant's work. That section provides:

Notwithstanding the other provisions of this law, if a deputy finds that a claimant has been discharged for misconduct connected with the claimant's work, such claimant, depending upon the seriousness of the misconduct as determined by the deputy according to the circumstances in each case, shall be disqualified for waiting week credit or benefits for not less than four nor more than sixteen weeks for which the claimant claims benefits and is otherwise eligible. In addition to the disqualification for benefits pursuant to this provision the division may in the more aggravated cases of misconduct, cancel all or any part of the individual's wage credits, which were established through the individual's employment by the employer who discharged such individual, according to the seriousness of the misconduct. A disqualification provided for pursuant to this subsection shall not apply to any week which occurs after the claimant has earned wages for work insured pursuant to the unemployment compensation laws of any state in an amount equal to eight times the claimant's weekly benefit amount.

§ 288.050.2, RSMo Supp.1998.

Station discharged Ms. Miller, according to remarks made at the hearing by its human resources director, because of a "culmination of performance issues, and decisions that ... we feel very strongly are not becoming of someone in the leadership role of our company." Station suggested that Ms. Miller lied about being ill and unable to work on December 31, 1997. Lying to one's employer has been held to be grounds for finding the employee barred from receiving benefits due to misconduct associated with work. *See Flanigan v. City of Kansas City,* 926 S.W.2d 98, 103 (Mo.App.1996).

Although the appeals referee did not find that Ms. Miller lied, and there was no evidence that she lied, the referee found that she exhibited an *intentional and substantial disregard for her employer's interest in accompanying her husband to Sam's Town when she had been advised by her physician not to work.* Ms. Miller's misconduct, according to the referee's opinion, was not in failing to be at work on December 31, but rather was in going to Sam's Town the previous night, which created a likelihood that she would be too ill to work the next day. While we apprehend the sentiments of the referee's deci-

sion and the Commission's affirmance, the difficulty that presents itself for us on this appeal is that a determination of "misconduct connected with work," within the meaning of the statute, is a matter of law. Our duty, then, is to determine whether the Commission's ruling comports with applicable principles of law.

■ It is essential to keep in mind that whether an employer has solid grounds to terminate an employee is not the same issue as whether the former employee qualifies for compensation. Generally, employees may be terminated for poor judgment and irresponsible actions. However, such actions are generally not a ground for denying compensation. Although the employee has the burden of showing a prima facie case of eligibility, *Hessler v. Labor & Ind. Relations Comm'n*, 851 S.W.2d 516, 518 (Mo. banc 1993), when the employer claims that the applicant was discharged for misconduct, the burden shifts to the employer to prove the claim of misconduct connected with work. *Division of Employment Sec. v. Gardner–Denver Mach., Inc.*, 941 S.W.2d 13, 15 (Mo.App.1997); *Bartsch v. Moore*, 931 S.W.2d 877, 880 (Mo.App.1996).

### Misconduct Connected with Work

On December 30, when her supervisor telephoned Ms. Miller about working New Year's Eve night, Ms. Miller discussed with her the fact that she had been bleeding in connection with her pregnancy for several days, and that she probably would not be able to work New Year's Eve, depending upon what her physician had to say when Ms. Miller saw her physician later that day. It is undisputed that when Ms. Miller saw her doctor, the doctor recommended she avoid working, and also any lifting or excessive walking, through January 6. The record does not reveal whether, after talking to the doctor, Ms. Miller had any intention of trying to work New Year's Eve as Station requested. That night she agreed to go with her husband to Sam's Town, where they stayed at least five or six hours, later than 3:00 a.m. There is no evidence that Ms. Miller did anything other than accompany her husband and watch him play blackjack. Coincidentally, her supervisor also happened to be at Sam's Town that night. Her supervisor observed Ms. Miller and spoke briefly to her. The supervisor left after 3:00 a.m., and Ms. Miller was still there.

Station had asked Ms. Miller to come in at 3:00 p.m. Ms. Miller initially wanted to attempt to work on the 31st, but then decided against it, telephoned Station and left a message for her supervisor that she would not be coming in. Ms. Miller testified that she believed she needed to place the baby's welfare ahead of her job. This was her first attempt to discuss the matter further with her supervisor since before the doctor's appointment. The record does not reveal why Ms. Miller decided to attempt to work on the 31st – whether it was because her supervisor had seen her the night before, or because it was something she intended all along. The fact that she was seen at Sam's Town may have made her feel pressure to try to work on New Year's Eve, when, quite likely, she had not previously been planning to do so. In any event, upon learning that she had been out at Sam's Town for at least several hours on the night of the 30th, Station elected to discharge Ms. Miller upon her return a week later, reasoning that if Ms. Miller had been able to sit with her husband at the gaming tables on the 30th, she should also have been able to work New Year's Eve night.

The propriety of her termination is not at issue in this appeal. What is at issue is the lawfulness of her disqualification from seven weeks of benefits for misconduct.

### The Nature of the Misconduct

■ A key determination in this case is the exact classification of the alleged misconduct. It is not at first clear whether Ms. Miller was denied benefits because she was guilty of off-duty misconduct or be-

cause she was guilty of an unjustified absence. At the hearing, Station emphasized that Ms. Miller's absence was not the issue, and it focused instead on the off-duty casino visit. Absences, as a general rule, do not amount to "misconduct" when the absence is related to the employee's health concerns. For example, in *Gardner–Denver*, the employer utilized a no-fault absence policy. *Gardner–Denver*, 941 S.W.2d at 14. An employee was terminated for excessive absenteeism. *Id.* The only documented absence showed that the employee was absent due to an illness. *Id.* The Commission found misconduct associated with work because of the employee's violation of his employer's absence policy. *Id.* This court reversed the Commission, holding that "[v]iolation of an employer's absence policy, which may be adequate cause for dismissal, is not, standing alone, necessarily a finding of misconduct connected with work, so as to deny unemployment benefits." *Id.* at 16. *See also Kelley v. Manor Grove, Inc.*, 936 S.W.2d 874 (Mo. App.1997); *G.C. Servs. Ltd. Partnership v. Labor & Indus. Relations Comm'n*, 913 S.W.2d 411 (Mo.App.1996); *Garden View Care Ctr., Inc. v. Labor & Indus. Relations Comm'n*, 848 S.W.2d 603 (Mo.App. 1993).

In the present case, the appeals referee's ruling focused on Ms. Miller's actions the night of December 30. To say that the absence was not itself the misconduct creates somewhat of a logical difficulty, because we all recognize that if Ms. Miller had worked the 31st, there would have been no adverse job action at all. Also, defining the misconduct as consisting of an unjustified absence presents the difficulty that Ms. Miller's physician had advised her to stay off work for a week, until her next appointment. The problem with focusing on the off-duty actions is not as obvious, but it is still presents a difficulty. While our experience teaches us that off-duty life commonly influences work performance, the focus in unemployment compensation cases is generally on the work-related conduct itself, not on the aspects of the appli-

cant's personal life which have an indirect but profound effect on work performance. Perhaps it is because we are reluctant to pry into the off-duty personal lives of the individual applicant because of privacy concerns. And related to that is a practical reason – that efforts to evaluate fault in an off-duty context can be extremely complicated because we seldom have all of the pertinent facts at our disposal in our effort to measure lack of loyalty to an employer's interests. So it is with this case; we know only a few of the many factors which might have entered into Ms. Miller's consideration as to whether to accompany her husband to the casino on the 30th. Thus, the pattern of our cases has been to disqualify applicants only when the off-duty conduct in question has been clearly egregious or illegal, or very closely tied to the workplace or the employer's interests. *See* James McLoughlin, Annotation,*Conduct or Activities of Employees During Off–Duty Hours as Misconduct Barring Unemployment Compensation Benefits*, 35 A.L.R.4th 691 (1985). The cases suggest that there must be a nexus between the employment and the off-duty behavior. *See* 76 Am.Jur.2d *Unemployment Compensation* § 87 (1992) (An employer must show that the employee's off-duty behavior "had some nexus with the employer's work, resulted in some harm to the employer's interests ... and was done with knowledge that the employer's interest would suffer.").

If the misconduct in this case is Ms. Miller's irresponsible off-duty casino visit, as it is asserted to be, we find very little legal support for the Commission's decision denying her seven weeks of benefits. We search in vain for any legal authority for the proposition that irresponsible casino visits, or irresponsible social activities, or late night parties, while off duty, and while under a doctor's restriction, amount to misconduct connected with work, especially when there is no specific evidence that the irresponsible actions were the direct cause of a subsequent work absence

or had a direct effect on the work environment.[1] This is not a case in which there is a clear connection between the misconduct and the effect on attendance, such as a case in which an employee commits an illegal act and is subsequently absent from work because of the employee's incarceration. *See, e.g., Stanton v. Missouri Div. of Employment Sec.*, 799 S.W.2d 202 (Mo. App.1990). Nor is it a case of a court employee misusing his court identification card and using a firearm to threaten a woman, in connection with off-duty business activities, as occurred in *Circuit Court of Jackson County v. Division of Employment Sec.*, 936 S.W.2d 611 (Mo. App.1997). Nor is it a case of dishonesty, as in *Brown v. Division of Employment Sec.*, 947 S.W.2d 448 (Mo.App.1997); or the disappearance of inventory, and improper handling of nightly deposits and inventory, as in *Koret of California, Inc. v. Zimmerman*, 941 S.W.2d 886 (Mo.App. 1997); or the making of false statements concerning prior back injuries, as in *Aaron's Automotive Prods., Inc. v. Division of Employment Sec.*, 926 S.W.2d 229 (Mo. App.1996); or lying to the employer about being sick, as in *Flanigan*, 926 S.W.2d 98; or violating the employer's rule to reconcile the funds from retail sales prior to completing a shift, as in *Hurlbut v. Labor & Indus. Relations Comm'n*, 761 S.W.2d 282 (Mo.App.1988); or of making derogatory references to the employer and threatening violence, as in *Simpson Sheet Metal, Inc. v. Labor & Indus. Relations Comm'n*, 901 S.W.2d 312 (Mo.App.1995).

In this case, the appeals referee inferred that Ms. Miller's irresponsible casino visit enhanced the likelihood that she would be absent from work the following night, and that Ms. Miller knew that she was jeopardizing her ability to go to work at 3:00 p.m. the next afternoon, as desired by her employer. However, as we have mentioned, there was no evidence that the casino visit on the 30th was the reason Ms. Miller declined to work on the 31st. Actually, what Station and the Commission are really focusing on is the perception that Ms. Miller failed to put a high priority on Station's need for her services on New Year's Eve night. The Division argues on appeal that it is inferable that Ms. Miller "considered going out for entertainment to be a higher priority than resting so that she could perform her job on the 31st. . . ." The employer's argument in this case was that Ms. Miller had a "conflict of interest" (apparently between loyalty to her husband's desires and her employer's interests) and was obligated to put her employer first and to stay home and continue resting on December 30 rather than go out with her husband.

The failure to put a high priority on the employer's need for her services on a busy night, while grounds for discharge, does not fit within existing principles of law related to intentional misconduct connected with work. Such a proposition cannot be the basis of a practical rule of law related to the denial of benefits. Employees are commonly faced with "conflicts of interest," and it is not always misconduct to favor family or other activities, although such choices may seem frivolous to an observer. Also, the referee's conclusion that an employee has an obligation to "conduct her private life so that it [does] not interfere with her ability to work," while basically accurate, is far too broad a principle to implement as the basis of the decision in this case without opening the door to the disqualification of many applicants whom the unemployment compensation laws have long benefited.

The denial of benefits in this case cannot be called capricious, or lacking in common sense, but in view of the lack of evidence

---

1. On appeal, the Division argues that because Ms. Miller had some managerial responsibilities, and had a casual attitude toward her employer's needs, to allow Ms. Miller to draw compensation would have a negative effect on the morale of other workers. There is no evidence in the record to support this suggestion. Nor is there evidence that Ms. Miller's absence seriously disadvantaged the employer.

that the casino visit directly resulted in an absence which would not have otherwise occurred, and in view of our duty to construe disqualifying provisions strictly, we cannot affirm the decision of the Commission. We are reluctant to reverse the Commission in its conscientious effort to reserve compensation benefits for those who are without actual, substantial fault in their loss of a job. However, in view of the factors discussed above, we cannot say that the facts of this case fit within established principles defining intentional misconduct connected with work.

## Conclusion

For the foregoing reasons, we conclude that Station failed to sustain its burden of establishing that Ms. Miller's actions amounted to intentional misconduct connected to her work. The judgment of the Commission is reversed, and the case is remanded to the Commission for reinstatement of Ms. Miller's right to benefits for the seven weeks for which she was found disqualified.