**Mary DIXON, Appellant,**

v.

**DIVISION OF EMPLOYMENT SECURITY, Respondent,**

**Medical Arts Research Collaborative, L.L.C., Defendant.**

**No. WD 61202.**

Missouri Court of Appeals, Western District.

May 6, 2003.

John R. Campbell, Jr., Campbell, Loughlin & Johnson, Kansas City, MO, for appellant.

Sharon A. Willis, Mo. Div. of Employment Security, Kansas City, MO, for respondent.

Before SPINDEN, P.J., BRECKENRIDGE and NEWTON, JJ.

PATRICIA BRECKENRIDGE, Judge.

Mary Dixon appeals from the decision of the Labor and Industrial Relations Commission disqualifying her from unemployment benefits for a period of four weeks under section 288.050.2, RSMo 2000.[1] On appeal, Ms. Dixon claims that the evidence is insufficient to support the Commission's finding that she was discharged for misconduct connected with her work that would justify the denial of unemployment benefits. Specifically, she asserts that there is insufficient evidence to prove that she intentionally and deliberately made mistakes during her employment as required for discharge for "misconduct connected with work" under section 288.050.2. Because this court finds insufficient evidence to support the Commission's decision that Ms. Dixon was discharged for misconduct connected with her work under section 288.050.2, the decision of the Commission is reversed.

### Factual and Procedural Background

Ms. Dixon began working at the Medical Arts Research Collaborative, L.L.C., (MARC) on June 18, 2001. MARC is a clinical research site, which conducts clinical research trials on behalf of pharmaceutical companies. MARC hired Ms. Dixon as a clinical research coordinator for a ninety-day probationary period. Ms. Dixon was responsible for conducting the trials at the site and serving as the information conduit with sponsoring companies.

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

Specifically, Ms. Dixon's duties included attending meetings of the principal investigators, scheduling appointments of study subjects, administering study drugs, performing medical records discovery, obtaining medical histories, drawing laboratory specimens, taking vitals, and collecting data. On September 17, 2001, right before the end of her probationary period, Ms. Dixon was discharged from MARC.

Subsequently, Ms. Dixon filed for unemployment benefits. A deputy for the Division of Employment Security found that Ms. Dixon was discharged "because her inaccurate and inadequate work could have jeopardized the trial study as well as the participants." Thus, the deputy concluded that she was discharged for misconduct connected with her work and, as such, she was disqualified from receiving unemployment benefits for four weeks under section 288.050.2. Ms. Dixon appealed the deputy's decision to the Division of Employment Security Appeals Tribunal.

On December 11, 2001, the Appeals Tribunal held a hearing. At the hearing, Pamela LaSalle, president of MARC, testified that she discharged Ms. Dixon because she "just [was] not going to be able to use [Ms. Dixon] according to the standards that [she] had set for the [MARC]." Ms. LaSalle testified that she did not discharge Ms. Dixon for one specific incident, but instead for a "culmination of incidents" and because she was "not living up to expectations." She testified that she had various problems with Ms. Dixon, such as medical histories not being recorded properly, vital signs not being taken accurately, erroneous corrections of the patient records, and "too many" transpositions of numbers between source documents and the clinical research forms. In addition, Ms. LaSalle testified that Ms. Dixon was "somewhat aggressive, maybe a little argumentative, when it came time to appraise"

her work, and she had difficulties working with the sponsoring company's monitoring staff, which were brought to Ms. LaSalle's attention on a regular basis. Ms. LaSalle further testified that Ms. Dixon "spent a great deal of time visiting with other study staff and actually precluding them from getting some of their work done," but that when she told Ms. Dixon to stop visiting, Ms. Dixon "actually closed her door during the day so as not to have exchange with other employees."

Ms. LaSalle also stated that there were a couple of instances where Ms. Dixon gave the wrong packet of study drugs to a patient, and once Ms. Dixon wrongly enrolled a patient in a clinical trial. Ms. LaSalle testified that Ms. Dixon often turned in reports with corrections and food spills on them. Ms. LaSalle also said that one of her reasons for firing Ms. Dixon was that a sponsoring company was threatening to not give any more trials to MARC if Ms. Dixon was the clinical research coordinator because it did not think she was up to par. Ms. LaSalle, however, testified that Ms. Dixon did not have a problem with absenteeism or tardiness. Additionally, Ms. LaSalle said that she did not believe that Ms. Dixon was deliberately doing poor work or deliberately making mistakes.

Ms. Dixon also testified at the Appeals Tribunal hearing. She stated that she had eleven years' experience in the clinical research field, and that transposition errors were "fairly common" because of the fast pace of the work. She admitted that she gave two patients the wrong study packets, but said she immediately realized her mistake, asked the clinical research associate what to do, and was told that the clinical research associate would fix it. She also testified that when she wrongly enrolled a patient in a clinical study, the mistake was quickly discovered, and she

offered to resign but her resignation was not accepted. In addition, Ms. Dixon indicated that she "pretty much underestimated what it took to do the job." She said that the job "was a lot harder than what I anticipated, but I was really trying to do a good job."

After the hearing, the Appeals Tribunal affirmed the deputy's decision that Ms. Dixon was disqualified from unemployment benefits under section 288.050.2 because she was discharged for misconduct connected with her work. The Appeals Tribunal found that although "[t]here is certainly no suggestion that [Ms. Dixon] was doing anything wrong on purpose[,]" her "overall work performance indicates a persistent inattention to the accuracy and detail essential to the employer's operations[.]" The Appeals Tribunal further found:

> While no single episode would amount to more than a mistake, the combination of so many episodes, particularly such avoidable errors as transposition of numbers, indicates a significant lack of concern for the employer's interest in accuracy and [Ms. Dixon's] duty to make sure there were no mistakes in her work.

The Appeals Tribunal then concluded that Ms. Dixon was discharged for misconduct connected with her work and subject to disqualification of unemployment benefits for four weeks under section 288.050.2. On February 27, 2002, the Commission, with one member dissenting, affirmed the decision of the Appeals Tribunal and adopted the Appeals Tribunal's decision as its own. This appeal followed.

### Standard of Review

Unemployment compensation proceedings are governed by Chapter 288, the Missouri Employment Security Law. *Merick Trucking, Inc., v. Mo. Dep't of Labor &*

*Indus. Relations, Div. of Employment Sec.*, 933 S.W.2d 938, 940 (Mo.App.1996). Under section 288.210, decisions of the Labor and Industrial Relations Commission are appealed directly to the appellate courts. The statute provides that an appellate court may modify, reverse, remand for rehearing, or set aside a decision of the Commission only on the following grounds:

(1) That the commission acted without or in excess of its powers;

(2) That the decision was procured by fraud;

(3) That the facts found by the commission do not support the award; or

(4) That there was no sufficient competent evidence in the record to warrant the making of the award.

Section 288.210. *See also Merick Trucking, Inc.*, 933 S.W.2d at 940; *Miller v. Kansas City Station Corp.*, 996 S.W.2d 120, 122 (Mo.App.1999).

When reviewing the Commission's decision, findings of fact by the Commission, when supported by competent and substantial evidence and in the absence of fraud, are conclusive, and the appellate court's jurisdiction is limited to questions of law. Section 288.210. As the court has stated:

> Findings and awards of the Commission which are clearly the interpretation or application of the law, as distinguished from a determination of facts, are not binding on the court and fall within the court's province of independent review and correction where erroneous. And, where the findings of ultimate fact are reached not by a process of natural reasoning from the facts alone, but rather by application of law, it is a conclusion of law and subject to reversal by the court.

*Davis v. Research Med. Ctr.*, 903 S.W.2d 557, 571 (Mo.App.1995). To the extent the appeal involves evaluating evidence rela-

tive to the Commission's findings, "[this court] may not substitute [its] judgment on the evidence for that of the Commission, and [this court] defer[s] to the Commission's determinations regarding weight of the evidence and the credibility of witnesses." *Nell v. Fern–Thatcher Co.,* 952 S.W.2d 749, 752 (Mo.App.1997). To the extent this appeal involves questions of law, however, no deference is given to the Commission. *Id.* Thus, because the issue of "[w]hether an employee's actions constitute misconduct associated with [the employee's] work is a question of law," this court is "not bound by the Commission's determination on this issue." *City of Kansas City v. Arthur,* 998 S.W.2d 870, 873 (Mo.App.1999).

**Insufficient Evidence of Misconduct**

■ In her sole point on appeal, Ms. Dixon claims that the evidence is insufficient to support the Commission's finding that she committed "misconduct connected with her work" that would justify the denial of unemployment benefits under section 288.050.2. Specifically, Ms. Dixon argues that simple mistakes or incompetence cannot rise to the level of misconduct under section 288.050.2 without a showing that the mistakes were intentional and, here, there is no showing that she intentionally and deliberately made any mistakes.

■ If a person is fired for misconduct connected with her work, that person may be denied employment security benefits under section 288.050.2. Section 288.050.2 states:

Notwithstanding the other provisions of this law, if a deputy finds that a claimant has been discharged for misconduct connected with the claimant's work, such claimant, depending upon the seriousness of the misconduct as determined by the deputy according to the circumstances in each case, shall be disqualified

for waiting week credit or benefits for not less than four nor more than sixteen weeks for which the claimant claims benefits and is otherwise eligible.

While "[t]he employment security statutes do not define misconduct," section 288.020 directs that the Missouri Employment Security Law will "be liberally construed so as to further the public policy of Missouri in setting aside unemployment reserves to benefit persons unemployed through no fault of their own." *Arthur,* 998 S.W.2d at 873. Therefore, "disqualifying provisions in the law are strictly construed against the disallowance of benefits." *Id.* Applying this principle, Missouri courts have defined "misconduct" to mean:

"[A]n act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer."

*Id.* (quoting *Sain v. Labor & Indus. Relations Comm'n,* 564 S.W.2d 59, 62 (Mo.App. 1978)). Under this definition of misconduct, "poor workmanship, lack of judgment or the inability to do the job do not disqualify a claimant from receiving benefits on the basis of misconduct." *Powell v. Div. of Employment Sec., Labor & Indus. Relations Comm'n,* 669 S.W.2d 47, 51 (Mo. App.1984). Additionally, "whether an employer has solid grounds to terminate an employee is not the same issue as whether the former employee qualifies for compensation." *Miller,* 996 S.W.2d at 124. Although an employee's actions may be grounds for termination, they may not be grounds for denying compensation under

section 288.050.2. *Id.* Furthermore, the employer has the burden to prove that the employee's performance constituted misconduct connected with work. *Arthur*, 998 S.W.2d at 874.

Here, Ms. LaSalle, Ms. Dixon's employer, testified that in her three months at MARC, Ms. Dixon's work performance was not satisfactory. Ms. Dixon made numerous minor mistakes connected with her work, such as transposing numbers on forms and turning in work with food spills on it. In addition, Ms. LaSalle testified that Ms. Dixon made three more significant mistakes: Ms. Dixon wrongly enrolled a patient in a clinical trial and she gave two patients the wrong study packets during a clinical trial. Ms. LaSalle stated that she did not discharge Ms. Dixon for one specific incident, but instead for the "culmination of incidents" and because she was "not living up to expectations."

Ms. LaSalle also testified that although Ms. Dixon "spent a great deal of time visiting with other study staff," when she discussed this problem with Ms. Dixon, Ms. Dixon "actually closed her door during the day so as not to have exchange with other employees." Ms. LaSalle said that Ms. Dixon did not have a problem with absenteeism or tardiness. Further, Ms. LaSalle declared that she did not believe that Ms. Dixon was deliberately doing poor work or deliberately making mistakes.

This evidence of Ms. Dixon's actions must fall within the definition of "misconduct" to support a finding that she was discharged for misconduct connected with her work. As noted previously, Missouri courts have defined "misconduct" as (1) "an act of *wanton or wilful disregard* of the employer's interest"; (2) "a *deliberate violation* of the employer's rules"; (3) "a *disregard* of standards of behavior which the employer has the right to expect of his employee"; or (4) "negligence in such de-gree or recurrence as to manifest *culpability, wrongful intent,* or *evil design* or show an *intentional and substantial disregard* of the employer's interest or of the employee's duties and obligations to the employer." *Arthur*, 998 S.W.2d at 873 (emphasis added). Ms. Dixon's conduct clearly does not fall into the first, second, or fourth definition of misconduct. Those definitions all expressly require a showing of culpability on the part of the employee, and, here, the Commission specifically found that there was no evidence that Ms. Dixon "was doing anything wrong on purpose."

Since Ms. Dixon's actions clearly do not fall into the first, second, and fourth definitions of misconduct, the question is whether they fall into the third definition, "a disregard of the standards of behavior which the employer has the right to expect of his employee." *Id.* The term "disregard" is defined as either "an intentional slight" or "neglect." WEBSTER'S THIRD NEW INT'L. DICTIONARY 655 (1993). The Commission's conclusion that Ms. Dixon's actions were misconduct, despite its finding that she was not doing anything wrong on purpose, indicate that it interpreted "disregard" as including negligent conduct. That interpretation is contrary to the law that poor workmanship and mere negligence do not rise to the level of misconduct. *Powell*, 669 S.W.2d at 51. The context of the term "disregard" in the definition of misconduct indicates, instead, that disregard of the standards of behavior means "an intentional slight." This meaning of the term "disregard" is consistent with the other definitions of "misconduct" and consistent with the holdings of cases utilizing the "disregard of the standards of behavior which the employer has the right to expect of his employee" definition to find misconduct. *See, e.g., Brown v. Div. of Employment Sec.,* 947

S.W.2d 448, 451–52 (Mo.App.1997); *Circuit Court of Jackson County v. Div. of Employment Sec.*, 936 S.W.2d 611, 614 (Mo.App.1997); *Hurlbut v. Labor & Indus. Relations Comm'n*, 761 S.W.2d 282, 285 (Mo.App.1988).

For example, in *Hurlbut*, the Southern District held that an employee who consistently did not follow a known procedure for the accounting of funds was discharged for misconduct connected with her work and subject to the denial of unemployment benefits under section 288.050.2. *Id.* at 285. The court found that the evidence that the employee knew of the procedure and repeatedly did not follow it "support[ed] the ultimate conclusion that [the employee] chose not to follow or to enforce the procedure prescribed by her employer." *Id.* The court noted that " '[w]illful misconduct is established when action or inaction by the claimant amounts to conscious disregard of the interests of the employer or constitutes behavior contrary to that which an employer has a right to expect from an employee.' " *Id.* (quoting *Gardner v. Commonwealth, Unemployment Comp. Bd. of Review*, 71 Pa.Cmwlth. 512, 454 A.2d 1208, 1209 (1983)). Additionally, in *Brown*, this court held that an employee disregarded her employer's expected standards of behavior when she received and kept computer equipment purchased from her employer by her husband in violation of a known procedure of the employer for purchasing products. 947 S.W.2d at 451–52.

In *Circuit Court of Jackson County*, this court held that an employee of the circuit court "disregarded standards of behavior which the circuit court had a right to expect of its juvenile workers" when he, in his side job as a process server, threatened a customer with a gun and tore at her screen door in an effort to get payment for his services. 936 S.W.2d at 614. *See also*

*Simpson Sheet Metal, Inc. v. Labor & Indus. Relations Comm'n*, 901 S.W.2d 312, 314 (Mo.App.1995) (employees' disregard of the standard of behavior that an employer has a right to expect was misconduct when they called their boss an obscene name during a conversation about paychecks); *Acord v. Labor & Indus. Relations Comm'n*, 607 S.W.2d 174, 176 (Mo.App.1980) (an employee's disregard of the standard of behavior that an employer has the right to expect was misconduct when she called her boss an "offensive and vulgar" name during a meeting). In all of these cases, there was a conscious intention to do the act that was found to be "a disregard of the standards of behavior which the employer has the right to expect of his employees."

Ms. Dixon's actions are distinguishable from the actions of these employees. Unlike the employees in these cases, there is no evidence that Ms. Dixon deliberately or purposefully did anything wrong. The Commission determined that Ms. Dixon was fired for misconduct because it found that her "overall work performance indicates a persistent inattention to the accuracy and detail essential to the employer's operations" and "a significant lack of concern for the employer's interest in accuracy and [Ms. Dixon's] duty to make sure there were no mistakes in her work." While these reasons are indicative of poor workmanship and grounds to fire Ms. Dixon, poor workmanship is not sufficient to "disqualify a claimant from receiving benefits on the basis of misconduct." *Powell*, 669 S.W.2d at 51. Thus, because there is no evidence that Ms. Dixon consciously committed mistakes in her work, and the Commission specifically found that she did not purposefully make mistakes, the evidence is insufficient to support the finding that Ms. Dixon was discharged for misconduct connected with her work under section 288.050.2.

The decision of the Commission disqualifying Ms. Dixon from unemployment benefits for four weeks under section 288.050.2 is reversed.

All concur.