**TAMKO BUILDING PRODUCTS, INC., Appellant,**

v.

**Stanley FRANKOSKI and Division of Employment Security, Respondents.**

No. 28775.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 5, 2008.

Greg B. Carter, Joplin, MO, for appellant.

Stanley Frankoski, Joplin, MO, pro se.

Larry Raymond Ruhmann, Jefferson City, MO, for Respondent, Department of Employment Security.

DON E. BURRELL, Judge.

TAMKO Building Products, Incorporated ("Employer" or "TAMKO") appeals a decision of the Labor and Industrial Rela-tions Commission granting unemployment benefits to Stanley Frankoski ("Claimant"). Employer contends that Claimant was fired for misconduct related to his work and was thereby disqualified from receiving unemployment benefits. After our review of the whole record, we find that the facts found by the Commission are supported by competent and substantial evidence and that Claimant's behavior did not constitute work-related misconduct. We therefore affirm the Commission's decision.

## I. Factual and Procedural Background

Claimant was hired by Employer on February 1, 1992, as its Corporate Director of New Product Development. Claimant possessed a PhD in Analytical Chemistry and had worked for twenty years at GAF Corporation in Wayne, New Jersey ("GAF") before coming to work for Employer. Seven of Claimant's years with GAF were spent as Director of Research and Development for its Building Materials Division. In 1993, Claimant was promoted to Corporate Director of Employer's research and development department; a position he held until his termination in 2006. As Corporate Director, Claimant's primary job responsibility was "to provide technical support for research and development projects" related to the roofing and building materials industries.

In October 2005, Tim Whelan ("Whelan"), an attorney, was promoted to Executive Vice President of TAMKO and became Claimant's direct supervisor. Shortly thereafter, Whelan met with Claimant to discuss Whelan's expectations regarding Claimant's duties and responsibilities. Whelan followed up that meeting with a written memorandum outlining those expectations. In both the meeting and memorandum, Whelan made it clear that

Claimant would be required to incorporate the principles of "Six Sigma" and "Total Quality Management" into all of his future work-product. This was the last documented communication between Claimant and Whelan regarding Claimant's job performance until July 21, 2006.

In early July, 2006, Claimant, of his own volition, drafted and distributed a written compilation of the history, evolution, and implementation of an already-existing formulary plan he had constructed to meet certain American Standards of Testing Materials guidelines ("the report"). Claimant referred to the report as a "white paper," and he distributed it to various TAMKO employees, including Whelan. The report was compiled from a number of previous reports, contained various charts and tables, and summarized which of TAMKO's plants were currently in compliance with the formulary plan and which plants still needed additional work in order to reach that stage. Over the weekend that followed Claimant's distribution of the report, Whelan sent Claimant an email detailing numerous problems he perceived with the report and informing Claimant that he expected to receive specific data that would support the report's conclusions within the following week. Claimant took offense at the nature of Whelan's email and felt as though Whelan was unfairly critical and was "nitpicking" Claimant's work.

The following Monday, during a routine meeting held to discuss the status of current projects, Whelan asked Claimant what he thought of his email message. Claimant told Whelan that he felt insulted by the email and that Whelan should have either called Claimant to voice his concerns over the report or simply asked in the email for the supporting data. Whelan proceeded to reiterate the contents of the email, and the two men engaged in a heated discussion about the nature of the report and what statistical analyses were necessary to include within such a document. At one point, when Whelan asked Claimant where the applicable data sets were, Claimant responded by leaning forward across the table between them, pointing to his own head, and saying "it's in here." Ultimately, the meeting concluded with Claimant assuming that he would compile the underlying data as Whelan had requested and present it within the next week. Claimant returned to his office and instructed his research and development team to begin amassing the necessary data.

The next day, Claimant reported to work as usual, but was summoned by Whelan and informed that he was being fired for insubordination.

Two days later, Claimant met with TAMKO's president, David Humphreys, to discuss a severance package that had been offered to Claimant at his termination. From the time of his termination to the hearing, Claimant was unable to find work, and he applied for unemployment benefits on April 17, 2007. After a Deputy of the Missouri Division of Employment Security denied Claimant benefits, Claimant appealed to the Appeals Tribunal. The Appeals Tribunal reversed the Deputy's decision and awarded Claimant unemployment benefits, finding that Claimant's actions were "unprofessional" and in "poor judgment," but did not constitute misconduct. TAMKO then appealed to the Labor and Industrial Relations Commission ("the Commission"). The Commission affirmed the ruling of the Appeals Tribunal and Employer now appeals to this Court.

## II. Standard of Review

Our jurisdiction in this matter is governed by statute. We review decisions

of the Commission and overturn or amend them only if we find that:

(1) [t]he commission acted without or in excess of its powers;

(2) [t]he decision was procured by fraud;

(3) [t]he facts found by the commission do not support the award; or

(4) [t]here was no sufficient competent evidence in the record to warrant the making of the award.

Section 228.210.[1] "We will not substitute our own judgment for that of the Commission's regarding its evaluation of the evidence relative to its findings." *Scrivener Oil Co., Inc. v. Div. of Employment Sec.,* 184 S.W.3d 635, 638 (Mo.App. S.D.2006). Further, we are bound by the Commission's findings of fact as long as they are supported by "competent and substantial evidence" and no fraud appears. *Id.*

### III. Analysis

The sole issue for our consideration in this case is whether Claimant's actions, as determined by the Commission, constitute "misconduct" as that term is defined under section 288.030.1(24) RSMo, Cum.Supp. 2005.

Missouri statutes allow unemployment benefits to be awarded to individuals who meet certain criteria. *See* section 288.010 *et seq.* Included within this statutory scheme is a section that prevents individuals from receiving unemployment benefits if "a deputy finds that a claimant has been discharged for misconduct connected with the claimant's work[.]" Section 288.050.2. Under section 288.030.1(24) RSMo, Cum. Supp.2005, "misconduct" is defined as

> ... an act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his

or her employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.

Section 288.030.1(24), RSMo, Cum.Supp. 2005.

 The burden of proving employee misconduct is on the employer. *Scrivener Oil Co., Inc.,* 184 S.W.3d at 641. To do so, the employer must demonstrate, by a preponderance of the evidence, that the employee "willfully violated the rules or standards of [the] employer" and the employee's actions "were not simply the result of poor workmanship, lack of judgment, or an inability to do the job." *Hoover v. Community Blood Center,* 153 S.W.3d 9, 13 (Mo.App. W.D.2005). *See also McClelland v. Hogan Personnel, LLC,* 116 S.W.3d 660, 665 (Mo.App. W.D. 2003). "Poor workmanship, lack of judgment[,] or the inability to do the job do not disqualify a claimant from receiving benefits on the basis of misconduct." *Hoover,* 153 S.W.3d at 13. Such deficiencies might be valid grounds for discharge but do not automatically result in a withholding of benefits. *Scrivener Oil Co., Inc.,* 184 S.W.3d at 641. *See also Hoover,* 153 S.W.3d at 14. "Absent evidence that [a] [c]laimant deliberately or purposefully erred, he cannot properly be found to have committed an act of misconduct." *Murphy v. Aaron's Automotive Products,* 232 S.W.3d 616, 621 (Mo. App. S.D.2007) (citing *Hoover,* 153 S.W.3d at 14, and *Dixon v. Div. of Employment Sec.,* 106 S.W.3d 536, 542 (Mo.App. W.D. 2003)).

 Our review of the entire record confirms that heated words were ex-

---

1. All statutory references are to RSMo (2000) unless otherwise noted.

changed between Claimant and Whelan and that each critiqued the other's background and working style. Whelan did not testify that he ever felt physically threatened during that heated discussion. Claimant also testified, without contradiction, that he left the meeting under the impression that the original week-long deadline for supplying the additional supporting data was still in effect and with an intention to timely comply with that demand. This factual record supplies ample evidence to support the Commission's finding that Claimant's actions, while showing "poor judgment," did not constitute the type of willful misconduct that would disqualify him from receiving unemployment benefits.

Employer points to *Koret of California, Inc. v. Zimmerman*, 941 S.W.2d 886 (Mo. App. S.D.1997), and *Dixon v. Stoam*, 216 S.W.3d 688 (Mo.App. S.D.2007), in support of its position that this Court must overturn the Commission's decision. Such reliance is misplaced, however, as the facts in those cases are materially different from the instant case.

In *Koret*, the claimant, who managed a clothing store, was discharged after upper management discovered she was not following a number of store policies regarding the handling of the employer's funds and merchandise. *Koret*, 941 S.W.2d at 887. The *Koret* court reversed the Commission's award of benefits when the claimant admitted that she had knowingly disregarded the various policies at issue. In doing so, the court emphasized the fact that the misconduct at issue related to the mishandling of the employer's funds. *Id.* at 888–89. In the case at bar, the policy at issue did not relate to any handling of Employer's funds and Claimant never admitted that he failed to adhere to Employer's policy.

In *Dixon*, the claimant was told by his direct supervisor to stop what he was doing and move to a different area to take up another task. *Dixon*, 216 S.W.3d at 691. The claimant responded by telling his supervisor that "he was working on something else and he 'wasn't going to stop what [he] was doing and go over there and do that the rest of the night.'" *Id.* The claimant was immediately fired, and the Commission—as well as this Court—subsequently found that his refusal to obey a direct supervisory order amounted to misconduct related to his work and thereby disqualified him from receiving unemployment benefits. *Id.* at 691–92. The Commission in the case at bar did not find that Claimant had deliberately disobeyed a direct order of his employer. The only evidence on point was Claimant's own testimony that he was told to supply the data and analyses underlying his report within a week's time and that he had every intention of doing so. Hence, *Dixon* is also factually distinguishable and provides no support for Employer's argument.

## IV. Conclusion

The Commission's finding that Claimant's actions did not rise to the level of misconduct that would disqualify him from receiving unemployment benefits was supported by competent and substantial evidence and we affirm the decision.

BARNEY, P.J., and RAHMEYER, J., concur.

Rehearing Denied Aug. 29, 2008.