**SCRIVENER OIL COMPANY, INC., Employer–Appellant,**

**v.**

**Thelma CRIDER, Claimant–Respondent,**

**and**

**Division of Employment Security, Respondent.**

No. SD 29502.

Missouri Court of Appeals, Southern District, Division One.

Jan. 19, 2010.

Rehearing Denied Feb. 9, 2010.

Application for Transfer Denied March 23, 2010.

Rick E. Temple, Springfield, MO, for Appellant.

Rachel M. Lewis, Jefferson City, MO, for Respondent Division of Employment Security.

DON BURRELL, Judge.

Scrivener Oil Company, Inc. ("Employer") appeals the decision of the Labor and Industrial Relations Commission ("the Commission") that Thelma Jeannie Crider ("Employee") was entitled to receive unemployment compensation benefits. Because Employer did not demonstrate that Employee was terminated for actions that constituted misconduct, we affirm the decision of the Commission.

## Procedural Background

The final incident that led to Employee's termination occurred on May 1, 2008. Employee was fired one week later. Four days after her employment was terminated, Employee filed a claim for unemployment compensation benefits with the Division of Employment Security ("the Division"). Employer protested that claim on the grounds that Employee was ineligible for benefits because she had been terminated for misconduct. On May 27, 2008, a Division deputy ruled in favor of Employee. Employer then timely pursued an administrative appeal before the Division's Appeals Tribunal.

Following a telephone hearing, the Appeals Tribunal rendered a decision that affirmed the deputy's determination that Employee's actions did not constitute misconduct and she was therefore not disqualified from receiving benefits. Employer then filed an application for a review of the Appeals Tribunal's decision by the Commission, and on October 21, 2008, the Commission affirmed and adopted the decision of the Appeals Tribunal. This appeal timely followed.

## The Evidence

The evidence before the Commission concerning Employee's termination was as follows. Employer owns and runs a chain of convenience stores. At the time of her termination, Employee had been working for Employer at its Mountain View location for approximately seventeen years. At the time of her discharge, Employee was a customer service representative and worked an overnight shift from 11:00 p.m. to 7:00 a.m.

Ms. Farris, the assistant manager at the Mountain View store, worked the shift immediately following Employee's. Ms. Farris and Employee both testified that on May 1, 2008, when Ms. Farris came to relieve Employee, Ms. Farris counted the contents of the store's money bag and informed Employee that it was twenty dollars short. At that point, Ms. Farris asked Employee to recount the money. Employee did so and agreed that it was twenty dollars short.

Employer's policy was that any shortage in the money bag was to be made up by taking money from the main register. Employee, who was working the main register, gave Ms. Farris twenty dollars from it to put in the money bag so it would contain the correct amount. Employee informed Ms. Farris that she and her coworker, Ms. Phillips, had both made

change out of the money bag that day when they needed more dimes, nickels, or quarters for their cash registers. As a result, Employee indicated it was difficult to ascertain which of the two of them had failed to put the correct amount back into the bag.

Employee testified that Ms. Phillips was allowed to get into the change bag because Ms. Phillips asked Employee for change while Employee was busy with a line of customers. Employee told Ms. Phillips to go ahead and get the money out of the bag because she trusted Ms. Phillips. Ms. Phillips testified that on busy days she has gotten her own change but denied getting any change from the bag on that particular day. After Employee left work, Ms. Farris immediately told Ms. Phillips that Employee had accused Ms. Phillips of taking twenty dollars out of the bag.

Employer's employees kept their receipts in plastic baskets that are approximately four by six-and-a-half or seven inches wide. These baskets were kept near the registers, with each of the two registers in the Mountain View store having its own basket. Employee testified that after she took her receipts out of the basket by her register, she went to return the basket to its usual location. As Employee approached, Ms. Farris, while waiting on a customer, stepped back from the register to allow its drawer to open. This movement resulted in Employee not having much space in which to maneuver. As a result, Employee testified that she got behind Ms. Farris in the aisle and "flipped" the basket onto the counter by the register. The basket landed in its usual place and did not hit anyone. Employee testified that employees have flipped baskets in the past.

After this occurred, Ms. Farris accused Employee of having "thrown" the basket and asked Employee why she was throwing it. Employee told Ms. Farris at the time that she did not "throw" the basket and testified at the hearing that she did not throw the basket.

Ms. Farris's testimony was that while she and Ms. Phillips were both waiting on customers, Ms. Farris saw a plastic basket "flying" right next to her. She admitted that she did not actually see Employee throw the basket but that she "saw that it was flying to [her] and [Employee] was the only one back there." Ms. Farris testified that she immediately asked Employee why she was throwing things and that Employee responded that she did not throw the basket. Ms. Farris testified that she believed Employee had thrown the basket because she (Employee) was angry about the money bag being short. Ms. Farris further testified that she reported the incident to the store manager as soon as he came in.

Ms. Phillips testified that she saw a "basket flipped to the counter."[1] She said she did not see where the basket had come from. Ms. Phillips testified that the basket did not come close to anyone or go over anyone's head. She stated that it did

---

1. Employer complains that the Commission ignored Exhibit E–9 in its written findings. That exhibit is a written statement by Ms. Phillips that states, in pertinent part, "I seen [sic] the moneybasket ... fly across the room." Employer argues the Commission's failure to cite and consider this testimony was erroneous under *Geiler v. Missouri Labor & Indus. Rel. Comm'n*, 924 S.W.2d 606, 609 (Mo.App. E.D.1996), because the Commission did not explicitly state it was disbelieved or found to be non-credible. This argument ignores the inherent discrepancy between this written statement by Ms. Phillips and her oral testimony at the hearing. This discrepancy was for the Commission to resolve and it obviously believed the characterization of the event given by Ms. Phillips in her oral testimony.

not slide, but that it did bounce slightly and then landed right where it belonged.

Ms. Teresa Wallis, Employer's operations manager, testified that Employee had previously been warned about what Employer perceived to be problems with Employee's performance and attitude that dated back to 2007. Employer also drafted an Employee Warning Notice dated November 14, 2007, that indicated Employee complained to both customers and fellow employees about not having enough help during her shift. That particular warning, however, was not signed by Employee.[2] The same complaint was set forth in Employee's annual evaluation dated December 29, 2007, a document that did contain Employee's signature. Additional evidence will be set forth below within our analysis of the point to which it relates.

### Standard of Review

■ "Article 5, Section 18 of the Missouri Constitution and section 288.210, RSMo 2000,[3] govern appellate review of an unemployment compensation case." *Ayers v. Sylvia Thompson Residence Ctr.*, 211 S.W.3d 195, 197 (Mo.App. W.D.2007).

On review, an appellate court may modify, reverse, remand for rehearing, or set aside the decision of the Commission only where: (1) the Commission acted without or in excess of its powers; (2) the decision was procured by fraud; (3) the facts found by the Commission do not support the award; or (4) there was no sufficient competent evidence in the record to warrant the making of the award. § 288.210, RSMo 2000. In the absence of fraud, the Commission's factual findings are conclusive if supported

by competent and substantial evidence. § 288.210, RSMo 2000.

*Id.* at 197–98. "As the trier of fact, the Commission may choose to believe or disbelieve all or none of the testimony of any witness." *Powell v. Division of Employment Sec.*, 669 S.W.2d 47, 50 (Mo.App. W.D.1984). "The Commission's finding as to facts, if supported by competent and substantial evidence, in the absence of fraud, are conclusive." *Simpson Sheet Metal, Inc. v. Labor & Indus. Rel. Comm'n of Mo.*, 901 S.W.2d 312, 313 (Mo. App. S.D.1995). We use a different standard when reviewing the Commission's determination of questions of law. "Questions of law are reviewed independently, and the appellate court is not bound by the Commission's conclusions of law or its application of law to the facts." *Ayers*, 211 S.W.3d at 198.

■ "The Supreme Court held that, 'there is nothing in the constitution or section 287.495.1 that requires a reviewing court to view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award.'" *CNW Foods, Inc. v. Davidson*, 141 S.W.3d 100, 103 (Mo.App. S.D.2004) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003)). Therefore, we consider the whole record in deciding whether the Commission's decision is supported by competent and substantial evidence. *Id.* "We, however, must accept the Commission's judgment on the evidence and defer to the Commission on determinations regarding weight of the evidence and the credibility of witnesses." *Silman v. Simmons' Grocery & Hardware, Inc.*, 204 S.W.3d 754, 755 (Mo.App. S.D.2006).

---

**2.** Employer's usual practice apparently involved having its employees sign any formal warnings they had been issued as a means of documenting that the warning had actually been received by the employee.

**3.** Unless otherwise indicated, references to statutes are to RSMo 2000.

"When the evidence of each party and inferences to be drawn therefrom conflicts, resolution of the conflicting inferences is the job of the commission, and its resolution is binding on the reviewing court." *Stanton v. Missouri Div. of Employment Sec.*, 799 S.W.2d 202, 203 (Mo.App. W.D. 1990).

## Analysis

For ease of analysis, we will address Employer's points out of order; dealing first with Employer's third point which challenges the sufficiency of the evidence to support the award, then addressing the other two in turn.

### Point III: Sufficiency of the Evidence

■ Employer's third point asserts that "the competent and substantial evidence supports the conclusion that [Employee] was discharged for 'misconduct conducted with work,'" because Employee "deliberately violated a rule or policy of [the Employer]," and because Employee "displayed a continued inability to work with and get along with her coworkers and a general bad attitude." The Commission's conclusion was to the contrary. Whether the facts as found by the Commission support its conclusion that Employee was not disqualified from receiving benefits pursuant to section 288.050.2 based on misconduct "is a question of law, and we are not bound by the Commission's decision." *Powell*, 669 S.W.2d at 50; *see also McClelland v. Hogan Pers., LLC*, 116 S.W.3d 660, 664 (Mo.App. W.D.2003).

Section 288.050.2, RSMo Cum.Supp. 2009, provides that a claimant may be disqualified from receiving unemployment benefits due to misconduct and reads, in relevant part, as follows:

> If a deputy finds that a claimant has been discharged for misconduct connected with the claimant's work, such claimant shall be disqualified for waiting week credit and benefits, and no benefits shall be paid nor shall the cost of any benefits be charged against any employer for any period of employment within the base period until the claimant has earned wages for work insured under the unemployment laws of this state or any other state as prescribed in this section. In addition to the disqualification for benefits pursuant to this provision the division may in the more aggravated cases of misconduct, cancel all or any part of the individual's wage credits, which were established through the individual's employment by the employer who discharged such individual, according to the seriousness of the misconduct.

■ "Generally, a claimant has the burden of showing that he or she is entitled to unemployment benefits." *McClelland*, 116 S.W.3d at 664. "However, when the employer claims that the applicant was discharged for misconduct, the burden shifts to the employer to prove the claim or [sic] misconduct connected with work." *Id.* (internal quotations omitted). Determining "whether certain conduct constitutes 'misconduct connected with his work' is a 'troublesome question,' and there is more to the issue than a simple or deliberate violation of an employer's rule of conduct." *Powell*, 669 S.W.2d at 50 (internal quotations omitted).

■ "The purpose of unemployment compensation laws is to 'benefit ... persons unemployed through no fault of their own.'" *Simpson Sheet Metal*, 901 S.W.2d at 314 (quoting section 288.020, RSMo 1994). "Section 288.020.2, provides that Missouri Employment Security Law, Chapter 288, RSMo, 'shall be liberally construed to accomplish its purpose to promote employment security ... by providing for the payment of compensation to individuals in respect to their unemploy-

ment.'" *McClelland*, 116 S.W.3d at 664 (quoting section 288.020.2). "Disqualifying provisions of the unemployment compensation law are to be construed against the disallowance of benefits to unemployed but available workers." *Simpson*, 901 S.W.2d at 314, (citing *Missouri Div. of Employment Sec. v. Labor & Indus. Rel. Comm'n of Mo.*, 651 S.W.2d 145, 148 (Mo. banc 1983)).

> An employee is disqualified from benefits if he *caused* his dismissal by his wrongful action or inaction or his choosing to not be employed. *Davis v. Sch. of the Ozarks, Inc.*, 188 S.W.3d 94, 101 (Mo.App. S.D.2006) (quoting *Shields [v. Proctor & Gamble Paper Products Co.*, 164 S.W.3d 540,] 544 [(Mo.App.E.D. 2005)] ). "The causation envisioned by the statutes 'is that having as its direct and immediate consequence the claimant's unemployment.'" *Id.* (quoting *Shields*, 164 S.W.3d at 544). Often, "'causation depends on whether the final act needed to effectuate separation was committed by the employee or by the employer.'" *Id.* (quoting *Shields*, 164 S.W.3d at 544).

*Ayers*, 211 S.W.3d at 198 (emphasis in original).

Missouri courts had uniformly applied the following definition of "misconduct" to the unemployment compensation act:

> An act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of the standards of behavior which the employer has the right to expect of his (or her) employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.

*McClelland*, 116 S.W.3d at 664; *see also Simpson*, 901 S.W.2d 312, 313. In 2004 (effective date January 1, 2005), the legislature codified this definition of misconduct which is now set forth in section 288.030.1(23), RSMo Cum.Supp.2009.[4]

■ "There is a 'vast distinction' between the violation of a rule of an employer that would justify the discharge of the employee and a violation of such rule that would warrant a determination of misconduct connected with the employee's employment so as to disqualify him for unemployment compensation benefits." *McClelland*, 116 S.W.3d at 665. "For a claimant's actions to be considered misconduct, there must be some form of 'willfulness' on behalf of the claimant." *Silman*, 204 S.W.3d at 756.[5]

*Dixon v. Division of Employment Sec.*, 106 S.W.3d 536, 541 (Mo.App. W.D.2003), distinguished willful from negligent conduct by listing the following examples of employee actions that amounted to a conscious disregard of the interests of an employer: 1) an employee *consistently choosing* not to follow a known procedure for the accounting of funds; 2) an employee

---

4. Section 288.030 was again revised in 2006. The definition of "misconduct" remained the same but was renumbered from subsection (24) to (23).

5. Although Employer cites several cases from the Commonwealth of Pennsylvania for the proposition that a progressive deterioration in an employee's job performance or a "conscious indifference to his employment duties" can be sufficient to support a finding of "misconduct," these decisions are not binding on this court and are inconsistent with the definition of misconduct found in *McClelland* and *Simpson, supra*. More importantly, Employer's challenge to Employee's benefits was not based on a progressive deterioration in Employee's job performance or a claim that her conduct amounted to a conscious indifference to her duties.

receiving and keeping computer equipment purchased from the employer in violation of the employer's *known* procedure for purchasing products; 3) a process server *threatening a customer with a gun* and tearing at the screen door in an attempt to get payment for his services; and 4) calling one's boss an obscene name or an offensive and vulgar name.

"In all of these cases, there was a conscious intention to do the act that was found to be a 'disregard of the standards of behavior which the employer has the right to expect of his employees.'" *Id.* at 542 (quoting *Hurlbut v. Labor & Indus. Rel. Comm'n,* 761 S.W.2d 282, 284 (Mo. App. S.D.1988)); *Brown v. Division of Employment Sec.,* 947 S.W.2d 448, 451–52 (Mo.App. W.D.1997); *Circuit Court of Jackson County v. Division of Employment Sec.,* 936 S.W.2d 611, 614 (Mo.App. W.D.1997). In contrast to these examples, the behavior at issue in *McClelland, supra*—an employee's failure to follow the employer's requirement that he inspect the fifth-wheel connection after every stop—was held not to constitute misconduct connected with his work, as a matter of law. *McClelland,* 116 S.W.3d 660 at 665–66.

The Appeals Tribunal's findings of fact, as adopted by the Commission, were as follows:

> The claimant was employed by this employer for seventeen years as a cashier in the employer's convenience store. She last worked and was discharged on May 7, 2008.
>
> The claimant was scheduled to work from 11:00 p.m. to 7:00 a.m. Another worker, Ms. Phillips[,] was scheduled to start work at 4:00 a.m. on May 1 and the supervisor, Ms. Farris, came in at 6:30 a.m. to relieve the claimant on May 1, 2008. The last event which caused the work separation was identified as having occurred on May 1, 2008. The supervi-

> sor, Ms. Farris, counted the money bag contents when she came in to work. She determined that the bag was short twenty dollars. She advised the claimant of that conclusion and instructed her to count the contents again.
>
> The claimant contends that she told the supervisor that both she and Ms. Phillips had made change out of the bag after it was counted. Ms. Farris however contends that the claimant told her that the money had just been counted but that Ms. Phillips had been into the bag. Ms. Phillips denied that she had obtained change from the bag or from the claimant. Ms. Phillips was told by Ms. Farris that the claimant had accused Ms. Phillips of taking twenty dollars from the bag.
>
> Upon being advised of the error regarding the money count, the claimant took the bag to an area behind one of the registers and re-counted the money as instructed. Ms. Farris was operating that register for the claimant. As she was standing there at the register, she described that a plastic basket, used for shift paperwork, came flying past her. She addressed the claimant and asked why she was throwing things.
>
> Both the claimant and the other worker, Ms. Phillips characterized the claimant as having flipped the plastic basket back onto the counter after it was emptied. The basket was described as approximately four inches by six and a half or seven inches. All of the individuals present described that the basket landed on the counter where it was always kept without striking anyone.
>
> The claimant was discharged by the store manager and was told that her discharge was the result of her attitude, throwing a basket at Ms. Farris and accusing Ms. Phillips of taking money out of the bag. The complaint described

for her had to do with a customer offering a gift card which initially did not go through. The claimant was told that the customer said the claimant did not have time to wait on him because she was changing shift. The claimant described that in fact she had told the customer that they had to have the gift card go through then rather than the customer returning later to pay for his purchases because they were going through shift change. She agreed to the customer leaving the card and the other worker Ms. Phillips agreed to finish the card if it did not go through before the claimant left.

The claimant had previously been warned about her attitude.

Unlike the actions of the employees listed in *Dixon*, Employee in this case testified that she did not deliberately or purposefully do anything wrong. The Commission determined that Employee did not throw the basket, nor did she accuse Ms. Phillips of taking money out of the change bag. Employee and an eyewitness testified that Employee "flipped" the basket. All three witnesses testified that the basket landed where it belonged and did not hit anyone. Employee testified that she did not accuse Ms. Phillips of taking twenty dollars, but rather stated that both she and Ms. Phillips had made change out of the change bag that day. Which of the conflicting accounts of what took place was more credible was for the Commission to determine. *See Ayers*, 211 S.W.3d at 198. There is substantial evidence in the record supporting the Commission's findings of fact that Employee did not throw the basket or accuse Ms. Phillips of stealing money.

The record does reveal that Employee struggled with "cash control" and had apparently been written up for discussing work issues in front of customers. Employee was first given a warning on April 13, 2007, that stated she needed to improve her cash register accuracy. Employee handwrote on the back of the warning notice that sometimes the "register doesn't ring up right," and she has to "jiggle" or "shake lightly" the register "to get sales to go in." Employee also received a performance evaluation on September 29, 2007, which stated she needed to improve in cash control. That same evaluation also contained comments like, "enjoys job, generally a very good attitude," "Very nice job!" and "Excellent!" Employer produced another Employee Warning Notice, dated November 5, 2007, that stated Employee needs to "improve cash control immediately," but the employee signature line is blank and it is unclear whether this warning was ever actually given to Employee. The third Employee Warning Notice was dated November 14, 2007, and stated that Employee "openly complains to customers and other employees about not having any extra help one day out of the week." The form requests that Employee "[b]e more understanding of the situation we are in. Two employees short and still letting [Employee] have her vacation day as requested." Under a section entitled "Supervisor comments," it states, "Several customers have openly complained and a few employees. No other employees get upset about working alone overnights." This form is also not signed by Employee and the record does not otherwise indicate whether it was ever actually presented to Employee.

Employee's next performance evaluation, dated December 29, 2007, denied Employee a pay raise because her "[c]ash control still hasn't improved in three months since last evaluation." The "Areas for Improvement" section also states, "Please keep internal store problems in-

side the store. Do not involve customers; I.E.: no help on overnights a few times and openly complaining to customer!" This evaluation also states, "[Employee] has been [a] reliable employee for many years. Store always looks great when I follow [Employee]. Follows company policies and laws very well. Attendance is very good. Good employee, but really needs to work on cash control. Has had many warning letters but no improvement."

Employee received another warning notice, dated January 13, 2008, that stated, "Cash Control—Very serious problem" and "Improve cash control immediately." Employee's final warning notice was dated May 1, 2008, and stated, "[c]ash control— March cash control was $7.56 per shift or $150.00 off for the month. More than twice as much as next employee." It also stated that Employee "keeps track of every charge, credit card, check, etc including amount and person in case she's off again. This serves no purpose and takes more time than necessary."

The stated reason for Employee's termination was her "continued inability to work with, and get along with, her coworkers and her general overall bad attitude." None of Employer's separation paperwork stated anything about Employee's problems with cash control. As to the incident involving a complaint from a customer about Employee's handling of a gift card transaction, the Commission was entitled to believe Employee's explanation of what occurred—an explanation that denied any willful misconduct on her part.

While Employee's difficulties may have been sufficient grounds to dismiss her from employment, they were "not sufficient to 'disqualify [her] from receiving benefits on the basis of misconduct.'" *See Dixon*, 106 S.W.3d at 542 (quoting *Powell*, 669 S.W.2d at 51); *see also Scrivener Oil*

*Co., Inc. v. Division of Employment Sec.*, 184 S.W.3d 635, 641 (Mo.App. S.D.2006). "We recognize that poor workmanship, lack of judgment or the inability to do the job do not disqualify a claimant from receiving benefits on the basis of misconduct." *Powell*, 669 S.W.2d at 51. Employee's cash control problems may have indicated poor performance in that particular aspect of her job, but the record shows she had been trying to improve her cash register accuracy, even to the point of keeping track of every receipt, charge, and exchange. This difficulty with cash control did not amount to willful misconduct and was not a stated reason for her discharge.

There is competent and substantial evidence upon the whole record to support the Commission's determination that Employee was not dismissed for the type of misconduct that would disqualify her from receiving benefits and the Commission could have reasonably made its findings from the evidence before it. *See Helm v. Labor & Indus. Rel. Comm'n of Mo.*, 654 S.W.2d 327, 328 (Mo.App. S.D.1983). Point III is denied.

### Point I: Impartiality of the Referee

Employer's first point alleges Employer's due process rights were violated by the Commission when it affirmed the Appeals Tribunal's decision because the Appeals Tribunal's referee ("referee") "was not impartial but displayed a clear bias against [Employer] and advocated for [Employee]."

"Unemployment compensation proceedings are governed by Chapter 288, the Missouri Employment Security Law." *Croy v. Division of Emp. Sec.*, 187 S.W.3d 888, 892 (Mo.App. S.D.2006). "The procedural due process requirement of fair trials by fair tribunals applies to an administrative agency acting in an adjudicative

capacity." *State ex rel. AG Processing, Inc. v. Thompson,* 100 S.W.3d 915, 919 (Mo.App. W.D.2003). "In processing unemployment compensation claims, it is the Tribunal's responsibility to afford parties a reasonable opportunity for a fair hearing before rendering a decision." *Weinbaum v. Chick,* 223 S.W.3d 911, 913 (Mo.App. S.D.2007). "This requires reasonable and substantial compliance with principles of due process of law." *Weinbaum,* 223 S.W.3d at 913 (quoting *Brawley & Flowers, Inc. v. Gunter,* 934 S.W.2d 557, 560 (Mo.App. S.D.1996) and Section 288.190.3, RSMo Cum.Supp.2009). "In an administrative proceeding, due process is provided by affording parties the opportunity to be heard in a meaningful manner." *Weinbaum,* 223 S.W.3d at 913. "The parties must have 'knowledge of the claims of his or her opponent, have a full opportunity to be heard, and to defend, enforce and protect his or her rights.'" *Id.* (quoting *Brawley,* 934 S.W.2d at 560).

▉▉▉▉▉ "Decisions rendered by an administrative body are presumed to be valid, and appellants carry the burden of overcoming this presumption by establishing unfairness in the procedure." *Lusher v. Gerald Harris Constr. Inc.,* 993 S.W.2d 537, 543 (Mo.App. W.D.1999). Similarly, "[a] presumption exists that administrative decision-makers act honestly and impartially, and a party challenging the partiality of the decision-maker has the burden to overcome that presumption." *State ex rel. AG Processing, Inc.,* 100 S.W.3d at 920. "However, it is elementary that a referee must observe the strictest impartiality and show no favor to either of the parties by her conduct, demeanor or statements." *Lusher,* 993 S.W.2d at 543.

" 'Fair hearing' is defined in 35 C.J.S., page 598, as '[o]ne in which authority is fairly exercised, that is, consistently with the fundamental principles of justice embraced within the conception of due process of law.'" *Jones v. State Dep't of Pub. Health & Welfare,* 354 S.W.2d 37, 39 (Mo. App.K.C.D.1962). An administrative proceeding is considered a 'fair hearing' unless it "lacks the rudimentary elements of 'fair play' embraced within the requirements of due process." *Id.* at 39–40. For an administrative proceeding to be conducted "in accordance with fundamental principles of justice and fairness," that proceeding must be "conducted by 'an impartial officer,—free of bias, hostility and prejudgment.'" *Id.* at 40, (quoting 16A C.J.S., Constitutional Law, Section 628, p. 862).

Employer refers to several instances which it claims indicates the referee's bias in favor of Employee. First, Employer claims the referee "hassled" Employer's counsel and its primary witness regarding a procedure the referee used for the remarking and identifying of various exhibits to be offered by Employer as demonstrated by the following exchange.

[COUNSEL FOR EMPLOYER]: I'd first like to reference your attention to Employer's Exhibit 1.

[REFEREE]: Well wait just a minute. If you're going to want to use documents we follow the same procedure as the court. You identify the documents, I will mark it for identification, we'll make sure the other party has it, and then we'll go from there. What are you talking about?

[COUNSEL FOR EMPLOYER]: I'm talking about the Employer's Exhibit 1 that I pre-submitted.

[REFEREE]: Okay. Mr. [counsel for Employer], as I indicated I mark the documents. Tell me what the document is. I'll mark it for identification and then we'll go from there. What is the title of the document or its description

so that I know what you're talking about.

[COUNSEL FOR EMPLOYER]: So you want me to tell you that before I give it to the witness—I mean before I talk about it with the witness?

[REFEREE]: Mr. [counsel for Employer], I'd like the title of it and how many pages so that I can know what we're looking at so that I—

[COUNSEL FOR EMPLOYER]: Okay.

[REFEREE]:—can mark it for identification, okay?

[COUNSEL FOR EMPLOYER]: I have—based—based on your ruling I have seven additional documents that relate to events that occurred prior to the date in issue that will all be—I'm sure—in the same line of questioning. And I need to somehow get those in the record but I understand your ruling and I—I'm not meaning to in anyway offend—offend the Tribunal. How would you like me to handle these additional Exhibits to make sure that they're part of the record but without offending Your Honor based on your ruling on E–1?

[REFEREE]: I'm not quite sure what you're asking me, Mr. [counsel for Employer]. I'm not offended by anything. Are you asking if you—we can mark the documents and offer them and get a ruling?

[COUNSEL FOR EMPLOYER]: Yes.

[REFEREE]: Is that what you're wanting to do?

[COUNSEL FOR EMPLOYER]: Yes.

[REFEREE]: Okay.

[COUNSEL FOR EMPLOYER]: Because they all are the same—same line of relevancy that I just—

[REFEREE]: Okay.

[COUNSEL FOR EMPLOYER]:—explained as to E–1.

[REFEREE]: Mr. [counsel for Employer], we'll just follow the same procedure we did with the document that we marked.

[COUNSEL FOR EMPLOYER]: Okay. I'll be happy to do that. I just wanted to make sure that I didn't offend Your Honor by going through that process.

[REFEREE]: I'm not offended, Mr. [counsel for Employer]. You do your job and—and—and I'll do mine and we'll be happy with each other when the hearing's over. We're not offended.

. . . .

[COUNSEL FOR EMPLOYER]: [Addressing Ms. Wallis, Employer's principle witness] Can you describe for the record what that document is.

MS WALLIS: This is a copy of a standard per—employee performance evaluation on Ms. Crider dated September 29, 2007 showing the issues with her cash control being 7–03 shift and that she was to be—

[REFEREE]: Ma'am. Ma'am. MS. WALLIS: –no–

[REFEREE]: Ma'am, don't read from the document. He asked what it was. Answer that question and then stop.

[COUNSEL FOR EMPLOYER]: Ms. Wallis, do you have that document in front of you?

MS WALLIS: Yes.

[COUNSEL FOR EMPLOYER]: Could you describe for the Appeals Tribunal what that document is.

MS. WALLIS: Employee warning notice for Ms. Crider dated November 5, 2007, a warning for—

[REFEREE]: Ma'am—

MS. WALLIS: A third warning—

[REFEREE]:—wait just a minute. Just describe what it is. The document contents is not part of the question.

MS. WALLIS: Oh.

[COUNSEL FOR EMPLOYER]: Your Honor, she was describing exactly what it is. It's a warning notice—

MS. WALLIS: I—I don't know how else to explain it.

[REFEREE]: Proceed.

[COUNSEL FOR EMPLOYER]: What is the warning for?

MS. WALLIS: Cash—

[REFEREE]: Wait just a minute. The document states what it is for. Now if you—

MS. WALLIS: If I don't explain—

[REFEREE]: Ma'am.

MS. WALLIS:—what's in it—

[REFEREE]: Ma'am, don't get involved in this. I'm speaking to your attorney and your attorney represents you quite capably. Mr. [counsel for Employer], I understand that you will be offering the document and that the document has information on it. If the ruling is that it is received the document speaks for itself.

[COUNSEL FOR EMPLOYER]: I can't ask any questions about it?

[REFEREE]: You may ask—may ask questions as to its preparation, its retention, etc.

[COUNSEL FOR EMPLOYER]: But I can't talk about the document.

[REFEREE]: You may talk about the document as I've described.

[COUNSEL FOR EMPLOYER]: But I cannot ask her what the warning was for? Is that what you're telling me?

[REFEREE]: Do you have reason to believe that this witness gave the warning or has firsthand knowledge about the reason this document was issued? You may ask that question.

[COUNSEL FOR EMPLOYER]: She is the operations manager of the—

[REFEREE]: I—

[COUNSEL FOR EMPLOYER]:—business.

[REFEREE]:—understand. I understand.

Second, Employer argues that the referee "questioned witnesses extensively to try to imply [that Employee] was not the person who threw the basket...." Specifically, Employer complains about the following questions the referee asked Ms. Farris:

Q: [W]as there anyone in the vicinity from which the basket came?

. . . .

Q. Was there anyone other than Ms. Crider?

A. No, just Ms. Crider.

Q. Was there anyone else working in the store at that point in time other than you and Ms. Crider?

. . . .

A. Yes.

Q. Who else was working?

A. Rachel Phillips.

Q. Where was Ms. Phillips when this happened?

A. She was working at the other register.

Q: Okay. Tell me how this is laid out so that I can see it in my mind's eye, okay?

. . . .

Q. You said Ms. Phillips was in the store. Is that right? [ . . . ] But where was she located?

. . . .

Q: Okay. To your knowledge was anyone else in the area or had access to this area from which the basket came other than Ms. Phillips?

A: No

Employer relies on *Jones, supra,* a case in which the referee placed his own factual

observations in the record while questioning the claimant ("Mr. Jones, you look to be a normal person to me. You look of normal weight for a man of your height."). *Jones*, 354 S.W.2d 37 at 41. The referee in *Jones* also asked questions that presupposed the claimant did not want to work ("What is it that prevents you from working if you wanted to work?"). *Id.* On appeal, the court found these questions revealed that the hearing was an unfair one because the referee was openly expressing his pre-judgment of the controversy. *Id.*

Unlike the referee in *Jones*, the referee in the instant case did not exceed the scope of her lawful authority. *See Jones*, 354 S.W.2d at 41. The referee did not make comments on the evidence that amounted to unsworn testimony, nor were any of her comments favorable to one party or the other. Employer's argument in support of its claim of bias states that "[t]he true picture of such inappropriateness is best seen by a review of the entire transcript. However, by way of example: [a listing of the three complaints mentioned above with corresponding citations to the transcript]." Although our review of the Commission's decision is based upon the entire record, it is Employer's burden to demonstrate error, and we decline Employer's invitation to become its advocate by scouring the record for examples it has not specifically cited. *See Crawford County Concerned Citizens v. Missouri Dep't of Natural Res.*, 51 S.W.3d 904, 909 (Mo.App. W.D.2001).

■ The portions of the transcript Employer does identify show only that the referee actively participated in the hearing and asked questions of the witnesses. "These by themselves do not require reversal of the order. Nothing requires a judge to be inert in a hearing or trial, particularly one which he is called upon to decide." *Hanks v. Labor & Indus. Rel. Comm'n*, 639 S.W.2d 252, 253–54 (Mo.App. W.D.1982). Employer has failed to overcome the presumption that the referee was impartial. Point I is denied.[6]

### Point II: Evidentiary Rulings by the Referee

■ Finally, we consider Employer's argument that the Commission erroneously concluded Employee was not disqualified from receiving unemployment benefits because the referee "refused to admit into the record business records of [Employer] and evidence relating to complaints of customers about [Employee]."

Employer's counsel offered Exhibit E–1 into evidence as support for Employer's claim that Employee was terminated for misconduct connected with her work. Ex-

---

6. The third sub-part of Employer's point challenging the fairness of the hearing—that the referee's refusal to receive into evidence certain business records offered by Employer when Employee had lodged no objection to their admission revealed her bias—was not developed in Employer's argument section and no authority was cited for the proposition that an adverse evidentiary ruling by a referee demonstrates the referee's bias against the party offering that evidence. As a result, we consider this final complaint abandoned. *City of Kansas City v. Piercy*, 97 S.W.3d 513, 514 (Mo.App. W.D.2002). As to Employer's preserved claims of bias, it is, of course, impossible to get a full sense of the overall "feel" of a hearing from a written transcript; a medium that cannot convey the tone of voice, volume, or vocal inflections of a speaker. While the transcript here does not indicate the referee was biased against Employer, it does give the impression of a certain brusqueness. And although a referee does not commit legal error by refusing to receive unobjected-to evidence that is ultimately found to be irrelevant to the issues to be determined, the better practice would be to allow the proffering party to present it subject to a later determination of its probative value, if any.

hibit E–1 was a warning notice Employer had given to Employee in April of 2007. Employee did not object to it being admitted into evidence. Despite the lack of an objection, the referee questioned Employer's counsel as to its relevance and refused to receive it. Employer's argument for admitting the exhibit was as follows:

> Your Honor, the—the documents that I have pre-submitted to both Your Honor and to the claimant are documents that show the pattern that—that showed a bad attitude, that she was warned, and that it continued, and then you had the final incident. So it's—it's the information that the employer was aware of at the time of evaluating the last incident to determine whether or not to discharge the claimant.

The Referee refused to admit the exhibit on the grounds that it was not relevant or material to the last event that caused the work separation.[7] Employer's counsel then properly preserved the issue for our review by making an offer of proof at the hearing and including it in the record on appeal. That same process of offer, refusal, and preservation was then repeated in regard to Employer's exhibits E–1, E–2, E–3, E–5, E–6, E–7, and E–10.

 We initially note that "technical rules of evidence do not control an administrative hearing." *Kramer v. Mason*, 806 S.W.2d 131, 135 (Mo.App. E.D.

1991). "In addition, since decisions rendered by an administrative body are presumed to be valid, appellants carry the burden of overcoming this presumption by establishing unfairness in the procedure." *Kramer*, 806 S.W.2d at 135.

Employer cites 8 CSR 10–5.015(10)(B)(4) which states, "[. . .] Any evidence *received* without objection *which has probative value* shall be considered by the hearing officer along with other evidence in the case." (Emphasis added). Although Employer relies on this regulation as support for its position that the exhibits should have been received, "[t]he regulations further provide that '[e]vidence is admissible if it is not irrelevant, immaterial, privileged or unduly repetitious.'" *Weinbaum*, 223 S.W.3d at 914 (quoting 8 CSR 10–5.015(10)(B)(4)). The excluded exhibits mostly outlined Employee's "cash control" problems; a problem not listed by Employer as one of the reasons for Employee's termination.[8]

Although Employer argues the refused documents were relevant to prove that Employee was terminated for misconduct, the misconduct consistently and exclusively alleged by Employer was Employee's "inability to work with, and get along with her coworkers, and a general overall bad attitude," not on difficulties she had with "cash control." Because Employer did not claim that Employee was terminated for a

---

7. While we do not believe that evidence of alleged misconduct should be limited to that concerning the final precipitating incident that leads to an employee's termination, the excluded evidence was irrelevant on other grounds as explained hereafter.

8. The only refused exhibit that contained any information relevant to one of the stated grounds for termination—"general overall bad attitude"—was contained in Exhibit E–5 (an Employee Performance Evaluation of Employee dated 12/29/07) which contained the following in a box labeled "Areas for Improvement:" "Please keep internal store problems inside the store. Do not involve customers, IE: no help on overnights a few times and openly complaining to customer!" No evidence was introduced to indicate that Employee did not follow this directive after it was given and the same information was also contained in Exhibit E–4 which was received into evidence. The Commission was also free to disbelieve the testimony of Ms. Farris and Ms. Phillips that Employee had a poor attitude and believe instead the written performance evaluation that said Employee had "generally a very good attitude."

willful refusal to follow its cash control policies, the excluded exhibits were irrelevant and the referee did not err in refusing to receive them into evidence for that reason.

Other exhibits proffered by Employer that related to the May 1st incident and supported Employer's claim that Employee had an attitude problem were admitted into evidence by the referee. The received documents included a written warning Employee had received in regard to her poor attitude; handwritten notes from employees relating to the May 1st incident; the official Employee Separation Form; and Employer's formal protest of Employee's claim for benefits.

The cases relied on by Employer, *Weinbaum v. Chick,* 223 S.W.3d 911 (Mo.App. S.D.2007), and *Kirkegaard v. Northfork Outfitters, Inc.,* 201 S.W.3d 574 (Mo.App. S.D.2006), are inapposite. In both *Weinbaum* and *Kirkegaard,* the parties were completely denied the opportunity to examine a witness to the events that preceded the employees' terminations. In the instant case, Employer was allowed to question and cross-examine each witness and to introduce every document related to the reasons Employer gave for Employee's termination in its challenge to her application for benefits. Point II is also denied, and the decision of the Commission is affirmed.

BATES, P.J., and BARNEY, J., Concur.