Jeffery SPAIN, Appellant,

v.

R & L CARRIERS SHARED SER-
VICES; Division of Employment
Security, Respondents.

No. WD 73173.

Missouri Court of Appeals,
Western District.

Nov. 15, 2011.

Charles Kevin Baldwin, Liberty, MO, for Appellant.

Kenneth Paul Carp, Clayton, MO and Robert Anthony Bedell, Jefferson City, MO, for Respondents.

Division Three: JAMES E. WELSH, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

Jeffery Spain appeals the decision of the Labor and Industrial Relations Commission ("Commission") denying him unemployment benefits based upon a finding that he was discharged for misconduct connected with work. We affirm.

### Factual and Procedural Background

Jeffery Spain was employed as a dock worker and forklift operator by R & L Carriers Shared Services ("R & L") from September 2, 2008 until May 6, 2010. His job duties included operating a forklift for the purpose of loading and unloading customers' shipments. Prior to his employment, Spain completed forklift training and received his certification on August 28, 2008. On that same date, Spain signed an "Employee Acknowledgment Form" confirming that his "relationship with [R & L] is voluntarily entered into and is subject to termination by [Spain] or [R & L] at will, with or without cause, at any time." He acknowledged in writing that he had "received, read, and understand, and will comply with the policies, programs and benefits contained in [the employee] handbook and any revisions or supplements hereto." [1]

The employee handbook included a section on "Disciplinary Procedures," which stated the following, in pertinent part:

> As an employee, you are expected to comply with the Company's standards of behavior and performance. Any violation will be subject to disciplinary action, up to and including termination.
>
> \* \* \*
>
> It is not possible to list all behavior that is considered unacceptable. The following are examples of violations, which may result in disciplinary action up to, and including termination of employment.
>
> ● Violation of safety or health rules ... [.]

The above list of infractions is not an exclusive list of conduct which could result in discipline, up to and including termination. If conduct is viewed as disruptive, counter-productive, or in any way, threatening to the safe and efficient operation of the Company, its customers or the public, the employee will be disciplined up to and including termination. [Emphasis added.]

After completing forklift training, Spain began working for R & L on September 2, 2008. On February 17, 2010, Spain was discharged from R & L after he deliberately tampered with a forklift's computer system in order to increase the forklift's speed. After a peer review proceeding, he got his job back but was placed on notice that if charged with another preventable offense, he could be terminated.

---

1. He also received and signed a "Freight Handler Check List" form regarding employee information, i.e., company benefits, wearing a safety belt, viewing a "claims reduction video," and a film on proper loading and unloading of hazardous material.

Just a couple months later, on April 30, 2010, Spain was involved in two more workplace incidents. While another employee, Kevin McFadden, was sitting on his forklift at a complete stop on the freight dock, he noticed Spain driving his forklift directly towards him. As he approached "head on" towards McFadden, Spain turned at the last minute, but hit a skid[2] on the front of McFadden's forklift. At the point of impact, the two forklifts became stuck together and McFadden and Spain had to disconnect their forklifts before moving on. After disengaging his forklift, McFadden drove around the corner of the dock, parked, and stepped off of his forklift to check to see if the drum on his skid was leaking. He then proceeded to get back on his forklift and was beginning to drive away when his forklift was struck a second time by Spain's forklift. This time, the force of the impact caused McFadden to fall forward onto the shifters of his forklift, injuring him.[3] McFadden reported both incidents to his supervisor, Mike Thomas, who was also the operations manager at R & L. After an investigation conducted by R & L, Spain was terminated on May 6, 2010.

On May 13, 2010, Spain filed a claim for unemployment benefits with the Division of Employment Security ("Division"). R & L contested the claim on the basis that Spain was discharged for violating the company's reasonable safety rules and regulations which are in place for the safety and well-being of its employees. Specifically, R & L noted that Spain was terminated for gross negligence, violent forklift driving, placing fellow employees in danger, and abuse of company property. A deputy with the Division concluded that

Spain was ineligible for benefits because he had been discharged for misconduct connected with work for operating his forklift in an unsafe manner and striking McFadden's forklift, causing injury.

Spain filed an appeal with the Appeals Tribunal. The Appeals Tribunal held a hearing on August 4, 2010, and received testimony from McFadden, Spain, the service center manager from R & L, and a co-worker. After the hearing, the Appeals Tribunal issued its decision, affirming the deputy's determination that Spain had been discharged for misconduct connected with work. The Tribunal entered the following findings of fact and conclusions of law:

FINDINGS OF FACT:

The claimant performed services for the employer as a dock worker. The claimant operated a forklift. A forklift runs at a maximum speed of 8.5 miles per hour. In February 2010, the claimant was discharged because he had altered the controls to make the forklift run faster. The claimant was reinstated after a peer review.

The dock is about one city block long and about forty feet wide. There are 75 doors on the dock. About 14 forklifts operate at any given time. Forklifts occasionally bump or scrape each other.

On April 30, 2010, another forklift operator was sitting in his forklift on the dock. The other operator's forklift was not moving. The claimant was operating his forklift. The front wheel of the claimant's forklift hit a skid on the other operator's forklift. The claimant had attempted to turn right before the impact. A few minutes later, while the

---

2. A "skid" is a flat structure that supports shipping loads and/or containers in a stable fashion while being lifted and transported by a forklift.

3. The record indicates that the forklifts driven by the R & L workers were six-foot long and weighed approximately 5,000 pounds.

other forklift was in motion, the claimant again bumped into the other operator's forklift. The impact caused the other operator to hit the controls of his machine. The other operator sustained some injuries, but did not require medical treatment.

The other operator reported the incidents. The service center manager conducted an investigation. On May 6, 2010, the claimant was discharged for unsafe operation of his forklift.

The Appeals Tribunal specifically accepts the testimony of the other forklift operator about the sequence of events and the points of impact, as the other forklift operator made a report of the incidents near the time of the occurrences while events were fresh in his mind and as the other forklift operator had particular reason to remember the details. The claimant did not dispute hitting the other forklift, but testified to a different sequence of events and slightly different circumstances. The Appeals Tribunal also specifically finds unsupported by the evidence any suggestion that the claimant deliberately operated his forklift with the intent to "ram" the other operator's forklift.

\* \* \*

## CONCLUSIONS OF LAW:

The claimant was discharged from his employment with the employer on May 6, 2010, because he twice bumped into another operator's forklift on April 30, 2010. The issue in the appeal is whether the discharge was for misconduct connected with work, so as to disqualify the claimant for unemployment benefits.

The claimant must have been aware after his discharge and reinstatement that careful operation of forklifts was expected by the employer. The claim-

ant did not deliberately operate his forklift on April 30, 2010, with the intent to "ram" the other operator's forklift. Nonetheless, the claimant bumped into the other operator's forklift within minutes of the first incident. The first incident could be considered no more than an accident, or simple negligence without willful intent, which would not rise to the level of misconduct. *Dobberstein v. Charter Communications, Inc.,* 241 S.W.3d 849, 853 (Mo.App.2007). However, a second incident involving sufficient impact to cause the other operator to hit the controls on his machine, occurring within a few minutes of the first event, indicates that the claimant was operating his forklift on April 30, 2010, with such degree of negligence as to show an intentional and substantial disregard of the employer's interest in safety and his own duty to use care. Therefore, the Appeals Tribunal concludes that the claimant was discharged from his employment on May 6, 2010, for misconduct connected with work.

## DECISION:

The deputy's determination is affirmed. The claimant is disqualified for waiting week credit and benefits until the claimant has earned wages for insured work equal to six times the claimant's weekly benefit amount after May 6, 2010.

Spain filed an appeal with the Commission, which adopted and affirmed the decision of the Appeals Tribunal. Spain appeals.

### Standard of Review

 Appellate review of a decision made by the Labor and Industrial Relations Commission is governed by section 288.210, RSMo.[4] *Dixon v. Stoam Indus.,*

---

4. All statutory references are to the Revised Statutes of Missouri 2000, as supplemented,

*Inc.*, 216 S.W.3d 688, 692 (Mo.App.2007). We will affirm the Commission's decision unless the Commission acted without or in excess of its powers; the decision was procured by fraud; the facts do not support the decision; or there was no sufficient competent evidence in the record to warrant the decision. Section 288.210; *see also Freeman v. Gary Glass & Mirror, LLC,* 276 S.W.3d 388, 391 (Mo.App.2009). Thus, the Commission's findings, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and this court's jurisdiction shall be confined to questions of law and the application of law to the facts. *Meyer v. City of St. Peters,* 341 S.W.3d 132, 134 (Mo.App.2011); *Dixon v. Div. of Emp't Sec.,* 106 S.W.3d 536, 539 (Mo.App.2003). We defer to the Commission's determinations with regard to witness credibility and the resolution of conflicting evidence. *Finner v. Americold Logistics, LLC,* 298 S.W.3d 580, 581 (Mo.App.2009). However, whether a claimant's actions constitute misconduct related to work is a question of law, which we review *de novo. Wright v. Casey's Marketing Co.,* 326 S.W.3d 884, 887 (Mo.App.2010).

### Analysis

In his sole point on appeal, Spain contends that the Commission erred in denying his claim for unemployment benefits because there was no substantial and competent evidence to support its decision, and the Commission misapplied the law. Spain argues that he did not operate his forklift with such a degree of negligence as to show an intentional and substantial disregard of his employer's interest in safety and his duty to use care that would rise to the level of misconduct.

The purpose of the Missouri Employment Security Law is to benefit individuals

who are unemployed through *no fault of their own.* Section 288.020.1. A claimant is disqualified from receiving unemployment benefits if he or she has been discharged for misconduct connected with work. Section 288.050.2. "Misconduct" is defined as:

> [A]n act of wanton or willful disregard of the employer's interest, *a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his or her employee, or negligence in such degree or recurrence as to manifest culpability,* wrongful intent or evil design, *or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer* [.]

Section 288.030.1(23) (emphasis added).

Under this definition, misconduct may be established by an employee's deliberate violation of the employer's rules; or a disregard of the standards of behavior which the employer has the right to expect of its employees; or negligence in such degree or recurrence as to manifest culpability, or show an intentional and substantial disregard of the employer's interest or the employee's duties and obligations to the employer. *Scrivener Oil Co., Inc. v. Crider,* 304 S.W.3d 261, 268 (Mo.App. 2010); *Ottomeyer v. Whelan Sec. Co.,* 202 S.W.3d 88, 91 (Mo.App.2006). An employee's noncompliance with an employer's reasonable safety standards may constitute misconduct for purposes of disqualifying the claimant from receiving unemployment benefits. *Finner,* 298 S.W.3d at 584. While a claimant generally bears the burden of demonstrating that he or she is entitled to benefits, the burden shifts to the employer to prove misconduct connected with work when the employer claims

unless otherwise indicated.

the employee was discharged for misconduct. *Ottomeyer*, 202 S.W.3d at 91.

At the hearing before the Appeals Tribunal, McFadden testified that on April 30, 2010, he was sitting on his forklift at a complete stop, when he observed Spain heading towards him "going pretty fast" on the dock. He recalled that, "with the amount of people who [were] in the area and me sitting there," Spain was driving "definitely faster than what [he] needed to be going." McFadden stated that he and Spain made eye contact as Spain drove towards him, so he knew that Spain could see that he was sitting on his forklift and not moving. He indicated that Spain had plenty of room to go around his forklift instead of hitting him. McFadden testified that Spain "rammed into my forklift."

McFadden explained that after he and Spain were able to "unhook" their forklifts, he turned the corner and stepped off his forklift to check the skid and the drum he was hauling to make sure it was not leaking. He indicated that after checking the drum, he got back onto his forklift and was preparing to drive, when Spain drove back towards him and "plowed into me again." McFadden stated that Spain struck his forklift a second time within two minutes of the first incident, this time hitting the left rear of McFadden's forklift. McFadden testified that he believed the second incident was "completely intentional" and not by accident. McFadden recalled that Spain had no loads on his forklift either of the times that he was struck and that there was no reason for Spain to have driven his forklift so close to McFadden's forklift at the time of the incidents.

McFadden explained that when Spain struck his forklift the second time, the force of the impact caused him to fall forward onto the shifters of his forklift. He suffered injuries as a result, including bruised arms and ribs. McFadden report-

ed both incidents to his supervisor. He also stated that Spain contacted him by phone the day after the incidents to ask if he would testify on his behalf if he paid him "a couple hundred dollars" allegedly to report that the "incident never took place." Spain admitted that he had contacted McFadden after the incident, but denied offering to pay him to testify.

Spain testified that due to the heavy work load expected by the company, he would sometimes drive as "fast as the forklift can go" and that he had seen other forklift drivers bump into each other. He admitted that in February 2010, he had tampered with the computer system on his forklift to increase its ability to go faster. He acknowledged that after a disciplinary proceeding, he was discharged for the incident. After a peer review meeting, he was re-hired, with the understanding that he would not drive his forklift in an unsafe manner or beyond a certain speed. With regard to the April 30, 2010 incidents, Spain denied that he intentionally struck McFadden's forklift. When asked by counsel if he had hit McFadden's forklift, Spain responded, "I—the—the second time. The first time I bumped—I backed into his skid."

Daniel Graham, the service center manager at R & L, testified that prior to Spain's employment with R & L, he had completed training and had been instructed in the safe operation of a forklift and that he had received his forklift certification in August 2008. He indicated that the freight dock where Spain worked is a busy area with fourteen forklifts operating in a confined space and that the forklifts have speed limits for the safety of the employees. When asked whether the forklifts sometimes bump into each other, Graham indicated that it did not happen very often, but if it did occur, it would be because "somebody [was not] paying attention to

what they were doing" and that it was "very, very dangerous." He also testified that there had been zero (other) incidents of injury caused by unsafe forklift driving in the past six months at the company.

Graham testified that after Spain was discharged in February 2010 for tampering with a forklift to alter the speed, and then re-hired, he was on notice that the next time he was charged with any preventable offense "or anything in the workplace," that he could be terminated. Graham indicated that McFadden had reported that after Spain struck his forklift the first time, Spain "turned around and rammed him a second time." He stated that McFadden sustained injuries, including bruises to his arms and ribs, as a result of the incident, and that Spain's actions were sufficient grounds to warrant his termination. He indicated that Spain was discharged due to his gross negligence, violent forklift driving, placing fellow employees in danger, and abuse of company property.

On appeal, Spain does not dispute that the record supports his termination based on the operation of his forklift in such a manner that resulted in causing McFadden's injuries. Nevertheless, he maintains that his actions were "unintentional." Spain contends that while he may have "acted negligently or with poor judgment warranting his termination," his negligence does not rise to the level of misconduct so as to disqualify him from receiving unemployment benefits. He argues that both forklift incidents were merely "accidents" and that he was simply "engaged in the activities which were contemplated and encouraged by R & L" by working at a fast pace on the freight dock in order to complete his work assignments and make his hourly "quotas." [5] He further claims there was no showing of willful intent or that he substantially disregarded R & L's safety interests, because the company "set the quotas" and he was merely "attempting to comply with R & L's requirements" by working quickly to meet the load quotas. He asserts that he was merely "engaged in acts in furtherance of the goals of his employer."

Spain also maintains that the Appeals Tribunal failed to address how his culpability rose to the level of misconduct, rather than mere negligence. He asserts that the Tribunal found that he did not act with "malicious intent" with regard to either of the incidents. While there is no actual mention of "malicious intent" in the Tribunal's findings, we assume Spain is referencing the Tribunal's finding that Spain did not deliberately operate his forklift with the intent to "ram" into McFadden's forklift. We interpret this to mean that the Tribunal did not believe that Spain acted with any evil intent or bad motive designed to deliberately crash into McFadden's forklift in order to cause harm to him. This is not to say, however, that the Tribunal found Spain to be merely negligent or without culpability with regard to the *second incident*.

Contrary to Spain's assertion, the Tribunal, in its decision, as adopted and affirmed by the Commission, *did* address how Spain's actions rose beyond the level of mere negligence. The Tribunal specifically concluded that while the *first incident* of bumping into McFadden's forklift could be considered an accident, or simple

5. According to Spain, the company required forklift drivers to transport an average of eight to ten "bills" (loads) per hour. Spain claimed that he usually drove as fast as his forklift could go in order to decrease the time it took to load and unload shipments. He indicated that he averaged twelve to seventeen bills per hour. The maximum speed on the forklifts was 8.5 mph.

440

negligence without willful intent, Spain's actions with regard to the *second incident* indicated that he *operated his forklift with such degree of negligence as to show an intentional disregard of R & L's interest in safety and Spain's own duty to use care.* For these reasons, the Tribunal concluded that Spain was discharged from his employment for misconduct connected with work.

We do not disagree that there are certain instances where an isolated act of ordinary negligence does not constitute misconduct. *See, e.g., Buckley v. Safelite Fulfillment, Inc.,* 299 S.W.3d 757, 762 (Mo. App.2009); *Yellow Freight Sys. v. Thomas,* 987 S.W.2d 1, 4 (Mo.App.1998). That is not the case here. Under the statute, misconduct may be established where there is "negligence in such degree or recurrence as to manifest culpability, . . . or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer." Section 288.030.1(23); *Scrivener Oil Co.,* 304 S.W.3d at 268; *Ottomeyer,* 202 S.W.3d at 91.

 R & L had the right to expect its employees to not engage in conduct that would endanger the safety of others. Spain was fully aware of the safety standards expected by R & L and that his position as a forklift driver required him to utilize a high degree of care and safety while operating his forklift on the freight dock. Spain disregarded R & L's safety standards when he drove his forklift in such a careless manner that resulted in two workplace incidents within minutes of each other, the second of which caused injuries to McFadden. We find this evidence sufficient to demonstrate a conscious and substantial disregard for the safety of others, as well as a disregard of R & L's reasonable expectations and interests in maintaining a safe work environment.

 Despite Spain's characterization of his actions as "mere negligence" and "poor judgment," the Commission obviously did not believe that the *second incident* was the result of an isolated act of ordinary negligence on the part of Spain. The Commission's interpretation of whether a claimant's behavior and actions amount to misconduct is entitled to great weight. *Bartsch v. Moore,* 931 S.W.2d 877, 880 (Mo.App.1996).

For the foregoing reasons, we hold that the Commission's determination that Spain acted with such a degree of negligence as to show an intentional and substantial disregard of R & L's interests in safety and his own duty to use care is supported by competent and substantial evidence. The Commission did not err or misapply the law in concluding that Spain's actions constituted misconduct connected with work, thus disqualifying him from receiving unemployment benefits.

Accordingly, we affirm the Commission's decision.

All concur.